**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **Interprofession du Gruyère, et al.,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 1:20cv01174-TSE-TCB |
| | : | |
| **U.S. Dairy Export Council, et al.**, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

Table of Contents ......................................................................................................... i

Table of Authorities ..................................................................................................... ii

Introduction ................................................................................................................. 1

Statement of Undisputed Material Facts ...................................................................... 2

    Brief history of gruyere in the U.S. ...................................................................... 2

    The Consortiums' efforts to protect "gruyere" in the U.S. have failed. ................. 4

    The largest U.S. gruyere producer "fully supports" generic use of "gruyere." ....... 5

    U.S. retailers have rejected the Consortiums' efforts to protect "gruyere." ........... 6

    The Consortiums' current trademark application and opposition proceedings ....... 7

    The Consortiums' appeal of the TTAB ruling that gruyere is generic ................... 8

Argument ..................................................................................................................... 9

    I.  Governing Legal Standards ............................................................................... 9

        A.  Standards Governing Certification Marks ................................................... 9

        B.  Standard of Review in 15 U.S.C. §1071 Appeals ...................................... 10

    II.  Gruyere is Generic. ..................................................................................... 11

        A.  The primary significance of "gruyere" is to refer to a type of cheese. ....... 11

            1.  The FDA standard of identity, to which the USPTO defers, allows
               gruyere to be produced anywhere. ........................................................ 13

            2.  The Swiss Consortium acquiesced to massive amounts of generic use
               of "gruyere" produced by Emmi Roth. ................................................ 15

            3.  U.S. consumers encounter gruyere from many locations in the retail
               market. .............................................................................................. 17

            4.  The gruyere category in U.S. and international cheese contests
               includes gruyere from multiple non-Swiss, non-French locations. ....... 20

            5.  The vast majority of dictionaries, books, and articles discussing
               gruyere do not require production in Switzerland or France. ............... 22

            6.  Internet evidence demonstrates that gruyere can be produced
               anywhere. ........................................................................................... 23

            7.  The majority of gruyere cheese in the U.S. comes from non-Swiss and
               non-French producers. ....................................................................... 24

        B.  The Consortiums' limited efforts have not changed the status quo of
           genericness of gruyere in the U.S. ........................................................... 26

    III. The Consortiums Have Not Controlled the Term "Gruyere" in the U.S. ........... 28

Conclusion ................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*America Online, Inc. v. AT&T Corp.*,
243 F.3d 812 (4th Cir. 2001) ................................................................................. 26

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................... 11

*Booking.com B.V. v. U.S. Pat. and Trademark,*
*Off.*, 915 F.3d 171 (4th Cir. 2019) ........................................................................ 10

*Calista Enters. Ltd. v. Tenza Trading Ltd.*,
43 F. Supp. 3d 1099 (D. Or. 2014) ........................................................................ 12

*Dan Robbins & Assocs., Inc. v. Questor Corp.*,
599 F.2d 1009  (CCPA May 24, 1979) .................................................................. 13

*Ex parte Pocket Books, Inc.*,
1951 WL 4315 (Chief Examiner 1951) .................................................................. 24

*Express Homebuyers USA, LLC v. WBH Mktg. Inc.*,
323 F. Supp. 3d 784 (E.D. Va. 2018) .................................................................... 11

*Express Homebuyers USA, LLC v. WBH Mktg. Inc.*,
No. 1:17-cv-736,  2018 WL 6616675 (E.D. Va. Aug. 29, 2018) ........................... 12

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
198 F.3d 1143 (9th Cir. 1999) .......................................................................... 13, 15

*Glover v. Ampak, Inc.*,
74 F.3d 57 (4th Cir. 1996) ..................................................................................... 12

*Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*,
240 F.3d 251 (4th Cir. 2001) ................................................................................. 13

*Hyatt v. Kappos*,
625 F.3d 1320 (Fed. Cir. 2010) .............................................................................. 10

*In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*,
1986 WL 83578 (TTAB Mar. 19, 1986) ........................................................... 10, 13

*In re Hikari Sales USA, Inc.*,
Serial No. 86439012, slip op., 2019 WL 1453259 (TTAB Mar. 29, 2019) ............. 13

*In re Pennington Seed, Inc.*,
   466 F.3d 1053 (Fed. Cir. 2006)............................................................................... 24

*Institut National Des Appellations D'Origine v. Vintners Int'l Co.*,
   958 F.2d 1574 (Fed. Cir. 1992)......................................................................... 11, 14

*Kappos v. Hyatt*,
   566 U.S. 431 (2012).............................................................................................. 10

*Kellogg Co. v. Nat'l Biscuit Co.*,
   305 U.S. 111 (1938).............................................................................................. 12

*King-Seeley Thermos Co. v. Aladdin Indus., Inc.*,
   321 F.2d 577 (2d Cir. 1963)........................................................................... 15, 24

*Luxco, Inc. v. Consejo Regulador Del Tequila, A.C.*,
   2017 WL 542344 (TTAB Jan. 30, 2017)............................................................. 12

*Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.*,
   906 F.2d 1568 (Fed. Cir. 1990)....................................................................... 28, 29

*Retail Servs., Inc. v. Freebies Publ'g.*,
   364 F.3d 535 (4th Cir. 2004) ............................................................................... 11

*Royal Crown Co. Inc. v. The Coca-Cola Co.*,
   892 F.3d 1358 (Fed. Cir. 2018)....................................................................... 12, 13

*RXD Media, LLC v. IP Application Dev.*,
   377 F. Supp. 3d 588 (E.D. Va. 2019) .................................................................. 10

*Shammas v. Rea*,
   978 F. Supp. 2d 599 (E.D. Va. 2013) .................................................................. 12

*Sigma-Tau HealthScience, Inc. v. United States*,
   838 F.3d 1272 (Fed. Cir. 2016)........................................................................... 17

*Swiss Watch Int'l., Inc. v. Fed'n of the Swiss Watch Indus.*,
   2012 WL 504693 (TTAB Jan. 30, 2012)................................................... 15, 16, 29

*U.S. Pat. and Trademark Off. v. Booking.com B. V.*,
   140 S. Ct. 2298 (2020)......................................................................................... 11

<u>Statutes</u>

15 U.S.C. § 1064(3) ................................................................................................. 14

15 U.S.C. § 1064(5)(A)....................................................................................... 11, 36

15 U.S.C. § 1127....................................................................................................... 10

15 U.S.C. §1054 .................................................................................................. 10

15 U.S.C. §1071 .................................................................................................... 9

Rules

Federal Rule of Civil Procedure 56(a) .............................................................. 12

Regulations

21 C.F.R. § 133.10 ............................................................................................... 19

*21 C.F.R. § 133.149* ............................................................................ 8, 19, 35, 38

Other Authorities

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2021)
......................................................................................................... *passim*

## <u>INTRODUCTION</u>

This is a case of importance to the U.S. dairy industry—and international trade—because it relates to the contentious topic of the protectability of geographic indications (GIs). Protectable GIs are terms that identify a good as originating **only** from a particular location, for example "Florida" for oranges or "Vidalia" for onions. When appropriate, GIs can be protected through trademark law and, in certain jurisdictions other than the U.S., through other protection schemes. However, in many cases, such as this one, geographical terms have become the generic term for a type of product and cannot be protected.

This case is about cheese. The issue is whether "gruyere" cheese comes **only** from the Gruyère region of Switzerland and France and can be registered with the United States Patent and Trademark Office ("USPTO") as a certification mark—a type of trademark used to show consumers that goods have met certification standards. This is an appeal of the Trademark Trial and Appeal Board ("TTAB" or "Board") decision finding "gruyere" is generic and unregistrable.

The appellants are consortiums in Switzerland and France whose purpose is to create a market for and protect the term "gruyere" as a GI. The Swiss consortium is Interprofession du Gruyère, and the French consortium is Syndicat Interprofessionel du Gruyère (together the "Consortiums"). The three appellees (the "Opposers") opposed the application to register the word GRUYERE with the USPTO. Opposer United States Dairy Export Council is a trade association representing the global trade interests of U.S. dairy producers, processors, cooperatives, ingredient suppliers, and export traders. Opposers Atalanta Corporation and Intercibus Incorporated are importers and distributors of cheese, including gruyere.

The Opposers objected to the Consortiums' certification mark application on two independent grounds: (1) "gruyere" is a generic term; and (2) the Consortiums do not exercise reasonable control over the term. In a precedential decision, the Board held that "gruyere" is

1

generic and unregistrable. The Board did not reach a decision on the issue of control; it did not need to as either ground would bar registration of the term.

The term "gruyere" cannot be a certification mark because it does not signify to the U.S. public a type of cheese made *only* in Switzerland and France. The record below contains substantial and unrebutted evidence that, in the U.S., the primary significance of "gruyere" is as a type of cheese that is produced in *multiple* locations around the world. The record includes evidence concerning the quantities and origin of gruyere sold in the U.S., U.S. retailers' labeling and sourcing practices, U.S. federal regulations, dictionaries, evidence from cheese competitions, grocery samples, and restaurant menus. All show that gruyere can be made anywhere. The largest U.S. producer of gruyere, Emmi Roth, is even owned by a Swiss company—a member of the Swiss Consortium—but annually produces millions of pounds of gruyere in Wisconsin that is labelled "gruyere," is not certified by the Consortiums, and retails across the country.

In the U.S., gruyere is a generic term referring to a type or "genus" of cheese—just like cheddar, colby, parmesan, and asiago—and cannot be registered as a certification mark. Although this case is an important one, it is not a close one. This Court should affirm the Board's decision that "gruyere" cannot be registered as a certification mark.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**Brief history of gruyere in the U.S.**

1.      Gruyere cheese originated centuries ago in the Gruyère region of western Switzerland and east-central France. (Docket #23, ¶ 1; Sweeney Decl. Ex. 21, 15:13-17:19).

2.      Over the years, as cheesemakers left the region, they began to produce gruyere in other places, such as Austria, Germany, and the U.S. (Sweeney Decl. Ex. 21 10:20-11:24, 15:11-16:18; Ex. 22, GRUYERE-EDVA-4026, -4035.)

3.      The earliest data from the United States Department of Agriculture's (USDA) Foreign Agricultural Services is from 1995 and it shows that, at the time, gruyere was imported to the U.S. from not only Switzerland and France, but also from the Netherlands, Germany, Austria, Belgium, and Denmark. (Sweeney Decl. Ex. 1.)

4.      Cheesemakers in the U.S. have been producing gruyere since at least the late 1980s, when Roth Käse imported Swiss-style manufacturing equipment and began producing gruyere in Wisconsin. (Sweeney Decl. Ex. 21 10:20-11:24, 15:11-16:18; Ex. 22.)

5.      By the late 2000s, Roth Käse was annually producing more than 2 million pounds of gruyere in Wisconsin, making it the largest U.S. gruyere producer. (Sweeney Decl. Ex. 21, 36:15-37:16; Sweeney Decl., Ex. 2, GRUY-1447, -1567, -1581, -1942.)

6.      Roth Käse was purchased by Emmi AG, a Swiss company, and became Emmi Roth USA, Inc. ("Emmi Roth"), which continued selling gruyere in similarly massive quantities. (Sweeney Decl. Ex. 21, 13:11-14, 37:21-38:20; Sweeney Decl. Ex. 3, 9:25-10:3.)

7.      Meanwhile, the USDA's data shows that processed gruyere products continue to be imported from many locations, from 2010 onward (Sweeney Decl. Ex. 4):

| Partner | Product | UOM | 2010 Qty | 2011 Qty | 2012 Qty | 2013 Qty | 2014 Qty | 2015 Qty | 2016 Qty | 2017 Qty | 2018 Qty | 2019 Qty | 2020 Qty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Netherlands | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 874,441.0 | 809,544.0 | 882,399.0 | 1,127,736.0 | 1,561,731.0 | 1,805,074.0 | 1,584,139.0 | 1,713,230.0 | 1,930,106.0 | 2,045,449.0 | 1,613,043.0 |
| Netherlands | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 0.0 | 0.0 | 776.0 | 0.0 | 632.0 | 1,099.0 | 471.0 | 4,022.0 | 1,055.0 | 959.0 |
| Germany(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 824,777.0 | 744,689.0 | 764,373.0 | 702,747.0 | 507,872.0 | 537,846.0 | 526,169.0 | 426,187.0 | 443,616.0 | 527,996.0 | 346,111.0 |
| Germany(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 943.0 | 0.0 | 0.0 | 1,738.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4,134.0 | 0.0 | 0.0 |
| Switzerland(i) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 182,231.0 | 74,262.0 | 101,589.0 | 91,513.0 | 100,487.0 | 111,089.0 | 168,732.0 | 186,565.0 | 160,833.0 | 48,936.0 | 96,072.0 |
| Switzerland(i) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 382.0 | 435.0 | 1,124.0 | 754.0 | 109.0 | 1,015.0 | 0.0 | 0.0 | 0.0 | 13,374.0 | 36,393.0 |
| Switzerland(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 182,231.0 | 74,262.0 | 101,589.0 | 91,513.0 | 100,487.0 | 111,089.0 | 168,732.0 | 186,565.0 | 160,833.0 | 48,936.0 | 96,072.0 |
| Switzerland(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 382.0 | 435.0 | 1,124.0 | 754.0 | 109.0 | 1,015.0 | 0.0 | 0.0 | 0.0 | 13,374.0 | 36,393.0 |
| Egypt | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 37,752.0 | 42,340.0 | 63,380.0 | 49,513.0 | 47,539.0 | 66,131.0 | 61,094.0 | 71,745.0 | 61,219.0 | 73,453.0 | 61,248.0 |
| Egypt | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 0.0 | 2,752.0 | 0.0 | 0.0 | 0.0 | 1,614.0 | 481.0 | 12,980.0 | 47,226.0 | 34,060.0 |
| Denmark(i) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 18,394.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 43,304.0 |
| Denmark(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 18,394.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 43,304.0 |
| France(i) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 1,269.0 | 2,841.0 | 2,554.0 | 5,541.0 | 0.0 | 182.0 | 5,977.0 | 11,334.0 | 8,577.0 | 11,311.0 |
| France(i) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 38,177.0 | 30,948.0 | 11,997.0 | 13,843.0 | 12,372.0 | 32,144.0 | 15,502.0 | 4,838.0 | 3,652.0 | 4,839.0 | 2,244.0 |
| France(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 1,269.0 | 2,841.0 | 2,554.0 | 5,541.0 | 0.0 | 182.0 | 5,977.0 | 11,334.0 | 8,577.0 | 11,311.0 |
| France(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 38,177.0 | 30,948.0 | 11,997.0 | 13,843.0 | 12,372.0 | 32,144.0 | 15,502.0 | 4,838.0 | 3,652.0 | 4,839.0 | 2,244.0 |
| Austria | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 9,927.0 | 4,789.0 | 640.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 58,917.0 | 0.0 | 0.0 |
| Belgium(i) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 22,462.0 | 17,493.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Belgium(i) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 664.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Belgium-Luxembourg(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 22,462.0 | 17,493.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Belgium-Luxembourg(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 664.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ireland | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 7,516.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Czech Republic | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 23,684.0 | 39,052.0 | 39,052.0 | 18,612.0 | 19,526.0 | 29,392.0 | 56,436.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Italy(i) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 1,166.0 | 0.0 | 6,597.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 19,602.0 | 0.0 | 0.0 |
| Italy(i) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 10,948.0 | 8,269.0 | 12,060.0 | 8,139.0 | 6,618.0 | 0.0 | 0.0 | 4,437.0 | 0.0 | 521.0 | 0.0 |
| Italy(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 1,166.0 | 0.0 | 6,597.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 19,602.0 | 0.0 | 0.0 |
| Italy(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 10,948.0 | 8,269.0 | 12,060.0 | 8,139.0 | 6,618.0 | 0.0 | 0.0 | 4,437.0 | 0.0 | 521.0 | 0.0 |
| Tunisia | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5,832.0 | 6,998.0 | 0.0 | 0.0 | 0.0 |
| Grand Total | | KG | 2,281,636.0 | 1,917,032.0 | 2,059,998.0 | 2,134,728.0 | 2,386,922.0 | 2,727,571.0 | 2,605,215.0 | 2,622,746.0 | 2,905,836.0 | 2,847,673.0 | 2,434,069.0 |

3

8.      In fact, from 2010-2020, the Netherlands and Germany—*not Switzerland and France*—were the primary exporters of processed gruyere products to the U.S. (*Id.*) And more than 10 countries other than Switzerland and France exported these items to the U.S. during this 10-year period. (*Id.*)

9.      The majority of gruyere sold in the U.S. is produced in the U.S. or in other non-Swiss, non-French countries. (*See, e.g.*, Sweeney Decl. Ex. 3, DDX1; Ex. 4; Ex. 5. Costello Decl., ¶¶ 5-6 & GN2-3. *See also* Page 25, *infra*.)

**The Consortiums' efforts to protect "gruyere" in the U.S. have failed.**

10.     In Europe, through various legislative efforts, the European Union recognized Swiss gruyere with a protected designation of origin ("PDO") in 2011 and France's National Institute of Origin and Quality approved a protected geographical origin ("PGI") for French gruyere in 2012. (Docket #1-2 ("TTAB Opinion"), 19 & nn.35-37.)

11.     The term "gruyere" has no similar protection in the U.S. and is not treated as PDO or a PGI. In the U.S., geographic indications are protected (if at all) through trademark law. (*See, e.g.*, Sweeney Decl. Ex. 6; Ex. 20 at 2.)

12.     In 2010, the Swiss Consortium applied to register the words "LE GRUYERE" as a certification mark for cheese produced in Switzerland (though, notably, *not* cheese produced in France). (Sweeney Decl. Ex. 7.)

13.     The USPTO rejected the mark as generic, finding that "'gruyere' is a type or class of firm cheese made of cow's milk with a rich and nutty flavor." (*Id.*, GRUYERE-EDVA-9454.)

14.     The Swiss Consortium abandoned its original application (*id.*, GRUYERE-EDVA-9449) and instead sought and received a certification mark for a design:

4



(Sweeney Decl. Ex. 8.) This logo,[1] with stylized font, a stylized square containing the letters AOC, and a stylized Swiss cross, was deemed to be sufficiently distinct to function as a certification mark, and can be applied to cheese sold in the U.S. if the cheese originates in the Gruyère region of Switzerland. (*Id.*, GRUYERE-EDVA-9735.)

**The largest U.S. gruyere producer "fully supports" generic use of "gruyere."**

15.    In recent years, Emmi Roth has produced gruyere for two different channels of sale: under its house brand "Roth," and for private label sale to numerous retailers that sell the gruyere under their own house brands. (Sweeney Decl. Ex. 3, 10:17-20, 11:6-23, 16:5-17:5.)

16.    Even though Emmi Roth is now owned by a Swiss parent company, which is a member of the Swiss Consortium, Emmi Roth annually sells millions of pounds of domestically produced gruyere in the U.S. (Sweeney Decl. Ex. 2, GRUY-167, -169, -483, -1533, -1730.)

17.    In 2013, the Swiss Consortium struck a "deal" with Emmi Roth concerning the term "gruyere," in which Emmi Roth would remove the term "gruyere" from its house branded cheese, marketed under the "Roth" brand—but there would be no change to Emmi Roth's

---

[1] Opposers do not object to the Swiss Consortium's use of this logo as a certification mark. They *do* object to the Consortiums' attempt to remove the term "gruyere" from the public domain.

5

practices with respect to private label gruyere (gruyere sold under the brands of third parties).
(Sweeney Decl. Ex. 3, 31:9-35:10 & DDX2, DDX3; Exs. 9-11.)

18.    Emmi Roth domestically produces gruyere which is sold to U.S. consumers under
at least the following brands: ███████████████████████████
██████████████████████████. (Sweeney Decl. Ex. 3, 16:24-19:21,
42:2-45:6 & DDX12-DDX14.)

19.    From 2014-2020, Emmi Roth sold more than ███████████ of domestically
produced gruyere for consumption in the U.S. market. In 2020, alone, Emmi Roth sold ████
███████████ of domestically produced gruyere in the U.S. (*Id.*, 25:18-28:18 & DDX1.)
None of this cheese was certified by the Consortiums. (*Id.*, 28:12-18, DDX1.)

20.    And in at least one instance, Emmi Roth wrote a "Letter of Support" to a private
label customer explaining that it "know[s] of course that [customer] sells our Wisconsin-made…
cheese… as 'Mild Gruyere,'" and that Emmi Roth did not object to that labeling. (Sweeney Decl.
Ex. 12, 30:15-33:10, DDX31.) Instead of objecting, Emmi Roth "fully support[ed its] customers'
rights to determine the labeling of their private label products." (*Id.*, 33:21-33:2, DDX31.)

**U.S. retailers have rejected the Consortiums' efforts to protect "gruyere."**

21.    From 2012 to 2017, the Swiss Consortium sent a number of letters asking retailers
and manufacturers to stop using the word gruyere on non-Swiss, non-French cheeses—often on
the misleading basis of its registered logo and Emmi Roth's illusory agreement to stop using the
word. (*See, e.g.*, Sweeney Decl. Ex. 2, GRUY-126, -133, -175, -192, -204, -229, -232, -253, -
261, -273, -293, -324, -331, -348, -387, -391, -393, -398, -425, -427, -450, -461, -486, -2187
(cease and desist letters).)

22.    But, despite receiving letters, the following retailers and manufacturers rejected
the Swiss Consortium's request and still sell gruyere in the U.S. that is not produced in

Switzerland or France: **Boar's Head/Frank Brunckhorst** (Sweeney Decl. Ex. 2, GRUY131; Ex. 13, GRUY-9381-83, -9397-9400, -9403. Hoyt Decl. ¶¶ 5-8 & Brunckhorst-1-3); **Dairyfood USA** (Sweeney Decl. Ex. 2, GRUY-164, -1739); **Dietz & Watson** (Brzozowski Decl., ¶¶ 5-7, D&W-18-19, -22); **Finlandia** (Sweeney Decl. Ex. 2, GRUY-152, -1637, -1819; Ex. 13, GRUY-9384-85, -9396); **Foodworks** (Sweeney Decl. Ex. 2, GRUY-2346); **Intersource** (Sweeney Decl. Ex. 2, GRUY-167); **Red Apple** (Sweeney Decl. Ex. 2, GRUY-168; Ex. 13, GRUY-9406-07, 9414); **Trader Joe's** (Sweeney Decl. Ex. 2, GRUY-423, -480, -484; Ex. 13, GRUY-9427-31); **Wegmans** (Sweeney Decl. Ex. 2, GRUY-490; Ex. 12, 21:6-23:4, 28:7-29:22 & DDX21-23); and **Wood River Creamery/Burnett Dairy**, which stopped but then *resumed* selling gruyere (Sweeney Decl. Ex. 2, GRUY-133; Ex. 13, GRUY-9386-9396, -9417-9425).

**The Consortiums' current trademark application and opposition proceedings**

23.     After the Swiss Consortium's failed prior efforts, in 2015, the Consortiums jointly filed an application for a certification mark, this time for the standard character term GRUYERE—the word alone with no design elements or logo. (Sweeney Decl. Ex. 6.)

24.     The certification standard identified in the trademark application is a requirement that the cheese be produced in the Gruyère region of Switzerland and France. Thus, if registered by the USPTO, the word "gruyere" would be limited to use in U.S. trade to mean a cheese coming **only** from the Gruyère region of Switzerland or France. (*Id.*, GRUYERE-EDVA-10142.)

25.     The Opposers initiated proceedings in the TTAB opposing registration of the mark on grounds of genericness and the Consortiums' failure to control the mark. (*See, e.g.*, *id.*, GRUYERE-EDVA-10144; TTAB Opinion, 5.)

26.     The TTAB ruled in the Opposers' favor, finding that gruyere is generic for a type of cheese. (*See, e.g.*, TTAB Opinion, 52-56.) Because that finding was independently dispositive, the TTAB did not reach the control issue. (*Id.*, 65 n.174.)

27. In finding gruyere generic, the TTAB considered several categories of evidence:

    a. *Reference materials*, such as dictionary definitions, press uses, and trade publications, which it concluded "describe ***a category of cheese that may be made anywhere*** and evoke the Swiss and (occasionally) French origin of the cheese." (TTAB Opinion, 31-33, 52 (collecting evidence).)

    b. *Testimony and industry practice*, such as results of the World Championship Cheese Contest, which routinely included non-Swiss, non-French gruyeres (and for years went unchallenged by the Consortiums); smaller U.S.-based producers' of gruyere; the largeamount of gruyere imports from non-Swiss, non-French countries; and the lack of success of the Swiss Consortium's letter campaign. (TTAB Opinion, 47-48, 53, 55-58 (collecting evidence).)

    c. *Emmi Roth's sales* of millions of pounds of Wisconsin-produced gruyere, labeled "gruyere" when sold to U.S. consumers, which forms a massive part of the U.S. gruyere market. (TTAB Opinion, 53-54 (collecting evidence).)

    d. *Internet evidence*, a substantial amount of which exists indicating that gruyere comes from locations other than Switzerland and France. (TTAB Opinion, 33-42 (collecting evidence).)

    e. *The FDA standard of identity for gruyere,* 21 C.F.R. § 133.149, which does not limit the cheese to a geographic source. (TTAB Opinion, 62-63.)

All of the cited evidence appears in the record of the Board proceedings transmitted to the Court. (Docket #60.)

**The Consortiums' appeal of the TTAB ruling that gruyere is generic**

28. The Consortiums appealed the TTAB's decision to this Court, after which the

parties engaged in limited further discovery, which enhances the underlying TTAB record and

supports the decision, with among other things:

    a. the standards of identity remaining in place, unchallenged by the Consortiums (Sweeney Decl. Ex. 15, Supp. Resp. to Interrogatory No. 25).

    b. industry practice remaining consistent, as most U.S. gruyere comes from places other than Switzerland and France after which it makes its way into the market labeled as gruyere by some of the country's biggest deli cheese purveyors, major grocery chains, and restaurants (*See, e.g.*, Sweeney Decl. Ex. 3, DDX1; Ex. 4; Ex. 5; Ex. 13, GRUY-9381-83, -9397-9400, -9403; Costello Decl., ¶¶ 5-6 & GN2-3; Hoyt Decl., ¶¶ 5-8 & Brunckhorst-1-3); Brzozowski Decl., ¶¶ 5-7, D&W-18-19, -22);

    c. ████████████████████████████████████████████████████

8

██████████████████ (Sweeney Decl. Ex. 3, 25:18-28:18, 42:9-45:6, DDX1, DDX12-DDX14);

d.  no new evidence that additional parties have stopped using "gruyere" on non-Swiss, non-French cheeses;

e.  the internet evidence still being entirely or almost entirely uncontested, and much of it remains identical or nearly-identical to the websites relied on by the TTAB (Sweeney Decl. Ex. 14);

f.  the U.S.'s Harmonized Tariff Schedule referring to gruyere as a category of imported cheese with no origin restriction. (Sweeney Decl. Ex. 16); and

g.  a new producer, Glanbia, joining Emmi Roth in selling U.S.-made gruyere, ██████████████████████████████████████. (Costello Decl., ¶¶ 5-6 & GN2-3.)

## ARGUMENT

In this appeal under 15 U.S.C. §1071, the Court should grant summary judgment in favor of the Opposers and affirm the Board's finding that "gruyere" is generic and unregistrable. Although the Board reached only the genericness issue below, the Consortiums' lack of control of the term also bars registration of "gruyere" and the Court can consider the issue on the Opposers' counterclaims in this proceeding. *See* Dkt. 35. The doctrine of genericness applies to all categories of trademarks, while control is an issue specific to certification marks. The Opposers have established both genericness and the Consortiums' lack of control, but a finding of either one prevents registration of the Consortiums' proposed mark.

## I.   Governing Legal Standards

### A.  Standards Governing Certification Marks

In the U.S., GIs may be protected by trademark law only when they meet certain requirements. Specifically, Section 4 of the Lanham Act states that "collective and certification marks, including indications of regional origin, shall be registrable under this chapter, in the same manner and with the same effect as are trademarks, by persons… exercising legitimate control over the use of the marks sought to be registered… ." 15 U.S.C. §1054; *see also* USPTO

9

Policy Information available at: https://www.uspto.gov/ip-policy/trademark-policy/geographical-indications. Section 45 of the Lanham Act also defines "certification marks" to include terms to "certify regional or other origin." 15 U.S.C. § 1127.

Generic terms can never be registered as trademarks, certification marks, or any other type of mark. *See, e.g.*, *Booking.com B.V. v. U.S. Pat. and Trademark Off.*, 915 F.3d 171, 175-76 (4th Cir. 2019), *aff'd*, 140 S. Ct. 2298 (2020) (trademark); *In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*, 1986 WL 83578, at *3 (TTAB Mar. 19, 1986) (certification mark). In addition, a requirement specific to certification marks, a GI cannot be registered as a certification mark if the applicant for it "does not control, or is not able legitimately to exercise control over, [its] use." *See, e.g.*, 15 U.S.C. § 1064(5)(A). The gruyere mark fails both those requirements: it is generic and the Consortiums have not controlled it.

### B.  Standard of Review in 15 U.S.C. §1071 Appeals

In an appeal of a Board decision to a district court, there is a bifurcated standard of review. "[I]f new evidence is presented on a disputed question of fact, the district court must make *de novo* factual findings that take account of both the new evidence and the administrative record before the PTO." *RXD Media, LLC v. IP Application Dev.*, 377 F. Supp. 3d 588, 592 (E.D. Va. 2019) (citing *Kappos v. Hyatt*, 566 U.S. 431 (2012)). But "if no new evidence is admitted that relates to a disputed fact question, the reviewing court must apply the APA [short for the Administrative Procedure Act] substantial evidence standard to the PTO's findings of fact on that issue." *RXD Media*, 377 F. Supp. 3d at 592 (citing *Hyatt v. Kappos*, 625 F.3d 1320, 1336 (Fed. Cir. 2010), *aff'd and remanded*, 566 U.S. 431). Under this standard, the Board's findings of fact should be disturbed only if they are "arbitrary, capricious, or otherwise not in accordance with the law." *Id.* During discovery, the parties largely updated evidence from the Board proceeding. To the extent "new" evidence was developed, it is undisputed and no evidence was

adduced during discovery in the present action that rebuts or contradicts any fact from the record below. The substantial evidence standard is appropriate, but the result is the same even if the record is reviewed *de novo*.

The Court should resolve this dispute on summary judgment. Neither party has made a jury demand, thus any trial would be to the Court. But no trial is needed in this case. The Court can resolve this case under the familiar standard set forth in Federal Rule of Civil Procedure 56(a), which requires judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A genuine factual dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.    Gruyere is Generic.

"A generic name—the name of a class of products or services—is ineligible for federal… registration." *U.S. Pat. and Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2301 (2020). While genericness is a question of fact, the Court may resolve the issue on summary judgment when the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. *See also Express Homebuyers USA, LLC v. WBH Mktg. Inc.*, 323 F. Supp. 3d 784, 791 (E.D. Va. 2018) (Ellis, J.) ("*Express Homebuyers I*"; at summary judgment, finding phrase "we buy houses" was generic); *Retail Servs., Inc. v. Freebies Publ'g.*, 364 F.3d 535 (4th Cir. 2004) (affirming grant of summary judgment finding "freebies" mark generic); *Institut National Des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574 (Fed. Cir. 1992) (affirming grant of summary judgment finding term "Chablis" generic).

### A.  The primary significance of "gruyere" is to refer to a type of cheese.

A term is generic if its "primary significance" in the minds of the consuming public is an "indication of the nature or class of the product or service, rather than an indication of source."

*Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996) (citations omitted). *See also* 15 U.S.C. § 1064(3); J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:6 (5th ed. 2021) (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938)). Stated another way, a "mark is generic if it 'merely employs the common name of a product or service' and does not signify the source of the product or service or distinguish the particular product or service from others on the market." *Express Homebuyers USA, LLC v. WBH Mktg. Inc.*, No. 1:17-cv-736, 2018 WL 6616675, at *3 (E.D. Va. Aug. 29, 2018) ("*Express Homebuyers II*"; quotation omitted). If a term "answers the question 'what are you,' it is a generic term because it tells the buyer what the product is, not the source of the product." *Shammas v. Rea*, 978 F. Supp. 2d 599, 609 (E.D. Va. 2013) (citing MCCARTHY, *supra*, § 12:1).

Opposers do not dispute that gruyere cheese originated centuries ago in the Gruyère region of Switzerland and France. But—just like cheddar which originated in the English village of Cheddar, colby which originated in the city of Colby, Wisconsin, parmesan which originated generally in the Parma region of Italy, and asiago which originated in the Asiago Plateau in Italy—gruyere is a generic name in the U.S. because it tells consumers what it is and not where it is from.

To make the genericness determination, courts consider "any competent source" of evidence including: generic use in the marketplace; reference materials, such as dictionary definitions, press usage, and internet references; testimony of individuals in the trade regarding trade practices and understandings; and government regulations and similar materials. *See, e.g.*, *Royal Crown Co. Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1366 (Fed. Cir. 2018); *Luxco, Inc. v. Consejo Regulador Del Tequila, A.C.*, 2017 WL 542344, at *9-10 (TTAB Jan. 30, 2017); *Calista Enters. Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1116 (D. Or. 2014)

(citing *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1150-51 (9th Cir. 1999)); *Dan Robbins & Assocs., Inc. v. Questor Corp.*, 599 F.2d 1009, 1014  (CCPA May 24, 1979). A survey, though competent evidence of genericness, is not required to establish genericness. *See, e.g.*, *Royal Crown Co.*, 892 F.3d at  1366 ("any competent source"); *In re Hikari Sales USA, Inc.*, Serial No. 86439012, slip op., 2019 WL 1453259, at *3 (TTAB Mar. 29, 2019) (same); *Cooperativa Produttori*, 1986 WL 83578, at *2 (finding genericness without a survey). *See also Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 254-55 (4th Cir. 2001) (refusing to consider survey purportedly showing secondary meaning where term was so obviously generic).

The TTAB considered these types of evidence and correctly concluded that the public perceives gruyere as a type of cheese and is therefore generic and not registrable. On appeal, that evidence has only been bolstered, not contradicted.

### 1. The FDA standard of identity, to which the USPTO defers, allows gruyere to be produced anywhere.

In 1977, the U.S. government issued a "standard of identity" regulation that provides that cheese produced in any country can be correctly labelled "gruyere" in the U.S. According to the Food and Drug Administration ("FDA"), gruyere must meet certain ingredient, moisture and fat content, and production requirements; but it does ***not*** need to be produced in any particular geographic location, the Gruyère region of Switzerland or France notwithstanding:

§ 133.149   Gruyere cheese.

(a) *Description.* (1) Gruyere cheese is the food prepared by the procedure set forth in paragraph (a)(3) of this section or by any other procedure which produces a finished cheese having the same physical and chemical properties. It contains small holes or eyes. It has a mild flavor, due in part to the growth of surface-curing agents. The minimum milkfat content is 45 percent by weight of the solids and the maximum moisture content is 39 percent by weight, as determined by the methods described in § 133.5. The dairy ingredients used may be pasteurized. The cheese is at least 90 days old.

21 C.F.R. § 133.149(a). (*See also* Statement of Uncontested Material Facts ("SUMF") ¶¶ 27(e), 28(g).) In turn, 21 C.F.R. § 133.10, requires that the "[d]efinitions and standards of identity" promulgated under the Federal Food, Drug, and Cosmetic Act, "prescribe the name for each such food," and that the "act requires that this name appear on the label." Yet the Consortiums have never sought to challenge or change the FDA's standard. (SUMF ¶ 28(g).)

Administrative regulations are properly considered in assessing genericness. *See Vintners*, 958 F.2d at 1578, 1580-83. In *Vintners*, the Federal Circuit concluded that although the term "chablis" was controlled in France by a consortium, "the term is used in the United States as the generic name for a type of wine… ." *Id.* The court relied heavily on the standard of identity for chablis promulgated by the Bureau of Alcohol, Tobacco and Firearms (BATF), the agency responsible for alcohol, analogous to the FDA for cheese. *Id.* at 1580-83.

Elevating the importance of this standard of identity, the USPTO published a Trademark Examination Guide that requires deference to FDA standards when they exist. (Sweeney Decl. Ex. 20, 12-13 (USPTO Exam Guide 2-20 (May 2020).) The Examination Guide governs marks relating to cheeses and processed meats and requires the trademark examiner to determine whether there is an applicable standard of identity. The policy states that: "inclusion on the FDA or USDA list is ***strong evidence that the term is generic*** for the particular cheese or processed meat… ." (*Id.* (emphasis added).)

14

The Board properly considered and credited the standard of identity in the proceedings below and that finding is entitled to deference. Although the Trademark Examination Guide was published after the hearing in the Board proceeding below, the Consortiums have no evidence to rebut this USPTO policy, and *de novo* review provides the same result.

### 2. The Swiss Consortium acquiesced to massive amounts of generic use of "gruyere" produced by Emmi Roth.

In finding genericness, the TTAB credited both the large amount of domestically produced gruyere and that the Swiss Consortium acquiesced to this large amount of uncertified, generic use of the term "gruyere." (TTAB Opinion, 53-54.) The TTAB record contains unrebutted evidence showing that Emmi Roth produced—in Wisconsin—millions of pounds of cheese annually that is labeled as gruyere when sold to U.S. consumers. (TTAB Opinion 46.) The Swiss Consortium essentially consented to this activity. (TTAB Opinion, 51-54.)

When an applicant fails to object to a generic usage of its purported mark, it is an acquiescence. *See, e.g., Filipino Yellow Pages*, 198 F.3d at 1151 (crediting evidence of failure to prevent a generic use by a competitor and holding that "Filipino Yellow pages" is either generic or the "feeblest of descriptive marks"); *cf. King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579 (2d Cir. 1963). Specific to certification marks where "the owner of the mark has, implicitly or explicitly, given permission to others to use the mark," for uncertified goods such conduct bars registration. *Swiss Watch Int'l., Inc. v. Fed'n of the Swiss Watch Indus.*, 2012 WL 504693, at *7 (TTAB Jan. 30, 2012).

This is the case here. The Consortiums—in particular, the Swiss Consortium—have condoned and acquiesced in the sale of domestically produced gruyere by Emmi Roth. The following table shows how much domestically produced gruyere Emmi Roth made between 2012 and 2020:

[REDACTED]

(Sweeney Decl. Ex. 3, 25:18-28:18, 42:9-45:6, DDX1, DDX12-DDX14.)

In 2013, the Swiss Consortium and Emmi Roth entered a Memorandum of Understanding under which Emmi Roth agreed to support the effort to register "gruyere" as a certification mark and to stop calling its own Roth-branded cheese "gruyere." (SUMF ¶¶ 16-17.) No surprise: Emmi Roth is owned by a Swiss company, which is a member of the Swiss Consortium. (*Id.*)

Nonetheless, despite Emmi Roth's Swiss ownership, the Memorandum of Understanding expressly reserved Emmi Roth's right to sell its Wisconsin-made gruyere to customers who private-label it "gruyere." (*Id.*) This is the exact situation from *Swiss Watch*: "the owner of the mark has, implicitly or explicitly, given permission to others to use the mark without ensuring that their products or services meet the certification mark owner's standards." *Swiss Watch*, 2012 WL 504693, at *7. Worse than in *Swiss Watch*, even though Emmi Roth stopped using "gruyere" on its own brands, [REDACTED]

[REDACTED] (SUMF ¶¶ 18-20.)

On appeal, the evidence regarding Emmi Roth and its U.S. production of gruyere has only grown stronger. [REDACTED]

[REDACTED] (SUMF ¶ 28(c).) We also now know that Emmi Roth's agreement with the Swiss Consortium contemplated precisely this plan for Emmi Roth to continue these gruyere sales. Emmi Roth told one customer that Emmi Roth "know[s] of course that [customer] sells our

---

[2] [REDACTED]

Wisconsin-made… cheese… as 'Mild Gruyere,'" and did not object to that labeling. (SUMF ¶ 20.) Rather, Emmi Roth "fully support[ed its] customers' rights to determine the labeling of their private label products." (*Id.*) So that is exactly what this customer did: it continued purchasing Wisconsin-made gruyere from Emmi Roth, then sold that gruyere to customers under a label specifying the cheese was a Wisconsin-made gruyere. (*Id.* ¶¶ 19-20, 22.)

And beyond Emmi Roth, there is now another significant U.S. gruyere producer in the market: Glanbia, ████████████████████████████████████

████ (SUMF ¶ 28(g).) Together, Emmi Roth's and Glanbia's gruyere sales dwarf the sales of *all* French gruyere in the U.S. and come very near to matching *all* Swiss gruyere sales in the U.S. (*Compare* Sweeney Decl. Ex. 3, DDX1 & Costello Decl., GN2-3 *with* Sweeney Decl. Ex. 5.)

### 3. *U.S. consumers encounter gruyere from many locations in the retail market.*

Powerful evidence of the primary significance of the term "gruyere" comes from what consumers see when they buy cheese, in grocery stores, delis, or restaurants. In addition to the large producers like Emmi Roth and Glanbia, many smaller U.S.-based producers are also selling gruyere to U.S. consumers. (TTAB Opinion, 53.) Gruyere is also being imported from countries other than Switzerland and France at rates in the millions of pounds, none of which would qualify for certification under the Swiss or French standards.[3] (TTAB Opinion, 43-44, 54-55; SUMF ¶ 7.) In fact, the U.S.'s Harmonized Tariff System—a system used to classify imported products, *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1274 (Fed. Cir. 2016)—lists processed gruyere as a type of cheese, without specifying any particular origin.

---

[3] A small amount of this processed gruyere comes from Switzerland (~5%) and France (~0.5%). Despite its origin, the fact it is processed gruyere disqualifies it from the Consortiums' standards (*see* Sweeney Decl. Ex. 6, GRUYERE-EDVA-10367-96), meaning the Consortiums seem to be failing to control gruyere *even in their own countries*.

(SUMF ¶¶ 27(c), 28(g).) The total amount of gruyere sold in the U.S., including processed gruyere, that is not from Switzerland and France dwarfs the amount that is;, approximately *1.25 to 1.5 times as much* of the former is sold annually compared to the latter. (SUMF ¶¶ 9, 28(b).)

U.S. consumers see all of this non-Swiss, non-French gruyere labeled as gruyere. For instance, Boar's Head and Dietz & Watson—two large U.S. purveyors of deli cheeses—sell gruyere produced in Wisconsin and/or Germany, with consumers seeing the following labels:





(*See, e.g.*, Hoyt Decl., ¶¶ 5-8 & Brunckhorst-1-3 (████████████); Brzozowski Decl., ¶¶ 5-7 & D&W-18-19, -22 (████████████).)

In addition to the Boar's Head and Dietz & Watson products, others available for retail include: (1) a cheddar/gruyere blend produced in Estonia and sold under the Finlandia brand; (2) Wood River Creamery's multiple varieties of Wisconsin-produced gruyere/cheddar blends;

(3) domestically produced gruyeres sold under the Red Apple and Trader Joe's brands; and

(4) Emmi Roth's own Grand Cru line of gruyere, which is often still labeled as gruyere even

though Emmi Roth stopped calling it that. Sample labels for the four categories appear below:













 

(Sweeney Decl. Ex. 13, GRUY-9381-9400, -9403, -9417-25.) One large supermarket chain annually purchases more than a hundred thousand pounds of Wisconsin gruyere from Emmi Roth. (Sweeney Decl. Ex. 12, DDX21.) It labels the cheese as "MADE IN WISCONSIN," distinguishing it from a "LE GRUYERE SWITZERLAND AOP" product it also sells:

 

(*See, e.g.*, Sweeney Decl. Ex. 12, DDX21-DDX23.) There are also—quite literally—hundreds of restaurants and supermarkets in the U.S. selling gruyere made in Wisconsin and other non-Swiss, non-French locations. (*See, e.g.*, Sweeney Decl. Ex. 17, 20:7-25:9 & DDX17-DDX20.)

### 4. *The gruyere category in U.S. and international cheese contests includes gruyere from multiple non-Swiss, non-French locations.*

The cheese industry itself considers "gruyere" to be a type of cheese, rather than a GI, as demonstrated by annual cheese competitions held in the U.S. and abroad. These awards are valuable currency in the marketing of cheese to U.S. consumers; thus, the TTAB properly

credited this evidence in the decision below. (TTAB, 47-48). For example, Roth Käse included

its awards on its domestically produced gruyere (Sweeney Decl. Ex. 3, DDX4):



For the years for which there is evidence in the record, 1995-2018, the World

Championship Cheese Contest, held in Wisconsin, had non-Swiss and non-French gruyere

entrants and winners, including from the U.S., Australia, South Africa, and Denmark.

(TTABVUE #20 at 6, 17-48.)[4] Applicants knew about this, but did not object. (TTABVUE #28

at 244-53; #40 at 97-98.) In the current action, the Consortiums produced evidence from an

additional cheese contest—the World Cheese Awards—but this additional contest neither

undermines the results of the World Championship Cheese Contest nor even supports the

Consortiums' position. The World Cheese Awards are held in rotating European locations, thus

having no probative value to the meaning of gruyere in the U.S. (*See, e.g.*, Sweeney Decl.

Ex. 18, GRUY-2481-86.) And even this European-centric contest still allowed the entry of

apparently non-Swiss, non-French gruyere: a "Reserve Gruyere" produced by "Castelli **UK**" that

---

[4] "TTABVUE" refers to the TTAB docket. This entry refers to entry no. 20 on the TTAB record
transmitted to the Court.  (Docket #60.)

is not labeled "AOP," meaning that it does not satisfy the Swiss and French certification standards. (*Id.*, GRUY-2524, -2567 (emphasis added).)

This evidence all indicates that gruyere is a type of cheese; it is not a cheese that comes only from a specific region.

5.   ***The vast majority of dictionaries, books, and articles discussing gruyere do not require production in Switzerland or France.***

The Board also relied on reference materials describing gruyere—such as dictionaries, books, and articles—the vast majority of which do not specify production in Switzerland or France. In fact, the TTAB record contains more than 60 such references that do not specify production in Switzerland or France, and therefore weigh in Opposers' favor.

There are, for instance, unrebutted uses of gruyere in the press and trade publications, which do not require production in Switzerland or France. In the press, there were approximately 50 uses from May 2010 to February 2011, which discussed gruyere without reference to production in Switzerland or France. (TTAP Opinion, 31.) Another 10 press uses between 2001 and 2011 specifically discussed "Wisconsin gruyere," thus recognizing Wisconsin as a production location for the cheese. (TTAB Opinion, 31-32.) The Consortiums did not offer any opposing evidence into the TTAB record.

The Board considered dictionary definitions and trade publications, which on balance favored Opposers' position. For instance, the Board considered the following dictionary definitions of "gruyere" and "gruyere cheese":

| Source | Definition |
| --- | --- |
| *American Heritage Dictionary of the English Language* (5th ed. 2016; via thefreedictionary.com) | "A nutty, pale yellow, firm cheese made from cow's milk" |
| *Random House Kernman Webster's College Dictionary* (2010; via thefreedictionary.com) | "a firm yellow cow's milk cheese, esp. of France and Switzerland, having small holes" |
| oxforddictionaries.com | "A firm tangy cheese" |

| merriam-webster.com[5] | "*1 :* a pressed whole-milk cheese of a pale yellow color and nutty flavor and usually with small holes; *2 :* a process cheese made in small forms and wrapped in foil." |
|---|---|

(TTAB Opinion, 30-31.) The TTAB record also contains several trade publications, which acknowledge that Wisconsin cheesemakers produce gruyere and that the cheese was also being made in European countries other than Switzerland and France. (TTAB Opinion, 32-33.) Against that evidence, the Consortiums offered just four total pieces of evidence: two online-dictionary definitions, one printout of the publicly-editable Wikipedia, and one European guide to cheese (irrelevant to U.S. consumer perception). (TTAB Opinion, 48-49.)

Having been presented with this lopsided evidence—far more than 60 reference uses in Opposers' favor to just four in favor of the Consortiums—the TTAB concluded that they "are not restricted to a cheese produced in France or Switzerland or even originating in France or Switzerland." (TTAB Opinion, 30-31, 52.) On balance, these reference materials "describe a category of cheese that may be made anywhere." (TTAB Opinion, 52.)

On appeal, the Consortiums provided no new reference materials during discovery. The only new ones are a few additional trade publications, which are fully consistent with the record below: discussing gruyere as if it can be produced anywhere. (*See, e.g.*, Sweeney Decl. Ex. 22.)

### 6. *Internet evidence demonstrates that gruyere can be produced anywhere.*

The TTAB considered substantial internet evidence indicating that gruyere comes from Wisconsin, other places in the U.S., Austria, Germany, and other countries besides Switzerland

---

[5] Merriam Webster's online dictionary provides competing definitions of "Gruyère" and "Gruyère cheese," respectively. (TTAB Opinion, 31 n.56, 48 n.116.) The Consortiums submitted a definition of the former to the TTAB; Opposers submitted the latter, which does not specify origin in Switzerland or France. The TTAB did not find either definition to be dispositive.

and France. (TTAB Opinion, 33-42 (collecting and describing evidence), 58-61.) A few pieces of

this evidence warrant specific mention:

| Source | Description |
| --- | --- |
| cheesemakingrecipe.com | Provides a recipe for "Mak[ing] Homemade Gruyere Cheese," suggesting that gruyere can be made—quite literally—anywhere |
| wacheese-gifts.com | Calls Emmi Roth's "Grand Cru" line of products—which the Consortiums tout as the leading example of a company changing the name of its gruyere cheese—"gruyere," indicating that the cheese industry and purchasers still identify Grand Cru as gruyere |
| boarshead.com | A major seller of bulk deli and cheese products describes its Blanc Grue Gruyere Cheese as "made with milk from small family farms in Wisconsin" |
| cariboucoffee.com | National restaurant chain describes its Ham and Pretzel Gruyere Roll as including "Austrian Gruyere cheese." |

(TTAB Opinion, 33 (recipe), 34 ("Grand Cru gruyere", 35-36 (Boars Head and Caribou).)

As with the reference-material evidence, the Consortiums have done nothing to refute or

undermine this internet evidence. Nonetheless, where possible, the Opposers have identified and

produced additional consistent information, including copies of the websites relied on by the

TTAB where they were still available. (Sweeney Decl. Ex. 14.) As was the case before the

TTAB, this evidence skews entirely in favor of finding that gruyere can come from any location.

## 7. *The majority of gruyere cheese in the U.S. comes from non-Swiss and non-French producers.*

There is another important aspect of the primary-significance test: "majority usage

controls," and if the primary use of the mark in public is to specify the type of product, then the

mark is generic—"[e]ven if the seller educates a few customers to use the generic term as a

mark." MCCARTHY, *supra*, § 12:6 (citing, among others, *In re Pennington Seed, Inc.*, 466 F.3d

1053, 1056 (Fed. Cir. 2006); *King-Seeley*, 321 F.2d at 581 (2d Cir. 1963); *Ex parte Pocket

Books, Inc.*, 1951 WL 4315 (Chief Examiner 1951)). Here, a majority of the gruyere in the U.S.

is non-Swiss and non-French. For demonstrative purposes the table below shows non-Swiss,

24

non-French gruyere sold or imported into the U.S. compared to Swiss and French gruyere; it conservatively underestimates the former and overestimates the latter. (*See* Notes 6, 7, *infra*.) Even so, non-French, non-Swiss gruyere constitutes the majority:



(SUMF ¶ 9.) U.S. import data also shows that the Netherlands and Germany—*not Switzerland and France*--are the largest producers of imported processed gruyere. (SUMF ¶ 7.)

Thus, with the majority of the market by any calculation—without even considering the significant amount of additional evidence of the term's use in the U.S.—the word gruyere is generic for a type of cheese. The Consortiums are free to use their "Le Gruyere AOP" design mark (or for the French Consortium to similarly register a design mark):



But they are not entitled to claim exclusivity of the word gruyere for themselves, alone, to the

---

[6] This amount is a bare minimum and probably vastly underestimates the non-Swiss, non-French gruyere being sold in the U.S. market. We have calculated it based on just three sources: Emmi Roth's total sales *plus* Glanbia's total sales *plus* the total of processed gruyere imports (excluding Switzerland and France). (*See, e.g.*, Sweeney Decl. Ex. 3, DDX1; Ex. 4. Costello Decl., GN2-3.)

[7] This likely overestimates the amount of Swiss and French gruyere in the U.S. We calculated it by adding: the total amount of Swiss and French gruyere exports (Sweeney Decl. Ex. 5) *plus* the amounts shown as processed gruyere coming from Switzerland and France in the USDA's imports data (Sweeney Decl. Ex. 4). Additionally, the French Consortium did not produce French export data *at all* in the present action (and, even if they had, past years indicate it would be minuscule, no more than 50,000 pounds annually, which is why we have added the "~" symbol to indicate approximate amounts).

exclusion of the producers and importers of millions of pounds—the majority—of U.S. gruyere.

The TTAB "got it right," and whatever standard of review this Court applies the result should be the same: the Court should find gruyere generic and affirm the TTAB's decision.

### B.  The Consortiums' limited efforts have not changed the status quo of genericness of gruyere in the U.S.

The "only way for a generic name to be elevated over time into a trademark is through a radical change in consumer perception," an "extraordinarily rare event" that can be accomplished only "over a long period of time." McCarthy, *supra*, § 12:30. Thus, where a mark has been used generically in the marketplace, it cannot be registered as a trademark. *America Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 819-22 (4th Cir. 2001). That is true even if the party seeking to register the generic mark is the "most widespread user of the phrase," who presents a survey supporting its position. *Id.* It is just *that* difficult to reclaim a generic term. In "the entire history of American trademark law, the courts have held that only two terms that had been generic names were reclaimed." McCarthy, *supra*, § 12:30 (citing instances where SINGER for sewing machines and GOODYEAR for rubber products found to be reclaimed). Notably, however, neither of those instances involved "ordinary generic terms" that describe a type of item or article; instead, both cases dealt with "personal names which were originally used as marks." *Id.*

Against this backdrop, the Consortiums have not reclaimed gruyere from genericness. The mark has already been deemed generic by the USPTO and the Board. (SUMF ¶¶ 13-14.) To succeed in having the term deemed not generic, the Consortiums would need to become one of the "extraordinarily rare" situations where a mark was reclaimed—and the *first time it ever* occurred for a word describing a type of item. McCarthy, *supra*, § 12:30

The only evidence of the Consortiums trying to lift gruyere out of genericness comes in the form of letters that the Consortiums sent to several retailers seeking to have them stop using

the word gruyere on non-French, non-Swiss gruyere.[8] The Consortiums' letters were haphazard

at best and took place over a limited period of 5 years, hardly the sort of effort that would result

in a "radical change in consumer perception." *Id.* The letters provided inconsistent definitions of

gruyere—sometimes describing it as coming *only* from Switzerland (to the exclusion of France)

and other times describing it as coming from either Switzerland or France. (*See, e.g.*, Sweeney

Decl. Ex. 2, GRUY-354-55 (specifically objecting to French gruyere), -371, -425, -427

(specifically excluding France), -438, -447, -486.) The letters relied on misleading information,

such as that Emmi Roth had totally ceased its use of gruyere, when in reality Emmi Roth is, *to

this day*, selling millions of pounds of gruyere annually. (*See, e.g.*, Sweeney Decl. Ex. 2, GRUY-

186, -213, -229, -263, -302, -348, -443, -447, -486, -1518.) The letters were also limited in their

scope and reach: limited to that approximately 5-year time period (2012-2017), far less than the

more than *40 years* of use claimed by the Consortiums; limited to approximately 40 recipients

out of hundreds of gruyere sellers and producers who have been identified; and limited insofar as

the French Consortium wrote absolutely *none* of them. (*Compare* Sweeney Decl. Ex. 2

(sampling of letters; none from French Consortium) *with* Ex. 17, 20:7-25:9 & DDX17-DDX20

(identifying many more sellers than there were letter recipients).)

The letters were unsuccessful. Many recipients still sell non-Swiss, non-French gruyere.

(SUMF ¶ 22.) Even if the efforts had been successful, the TTAB pointed out that they would still

be entitled to little weight in establishing the distinctiveness of the gruyere mark. (TTAB

---

[8] The Swiss Consortium has engaged in some advertising using its LE GRUYERE
SWITZERLAND AOP *logo mark*. But that registered logo—which Opposers do not object to—
is different than their current quest for registration of the bare word GRUYERE, and therefore
that advertising is of no probative value in this case.

Opinion at 57-58 (collecting cases for the proposition that discontinuation of a mark's use upon threat of legal action shows a desire to avoid litigation rather than distinctiveness of the mark).)

In addition to failing in the retail space, the Consortiums did nothing to change the gruyere standard of identity, 21 C.F.R. § 133.149. (SUMF ¶ 28(a).) They did nothing to change the U.S.'s Harmonized Tariff Schedule, which recognizes import of gruyere from non-Swiss, non-French countries. (*See, e.g.*, Sweeney Decl. Ex. 15, Resp. to RFP No. 73.) For years, they ignored the World Championship Cheese Contest, which allowed non-Swiss, non-French gruyere entries, and even crowned them group winners. (SUMF ¶¶ 27(b), 28(d).) More recently, they have ignored a major U.S. gruyere producer, Glanbia, ███████████████████ ████████████████████████████████. (SUMF ¶ 28(g).)

The Consortiums' efforts do not justify the extraordinary finding that they have so radically changed the public's perception to justify altering the status quo. The Opposers have no objection to the Swiss Consortium's logo mark, but their efforts have not come close to justifying ownership of the word gruyere itself.

### III.    The Consortiums Have Not Controlled the Term "Gruyere" in the U.S.

A certification mark cannot be registered if the applicant "does not control, or is not able legitimately to exercise control over, [its] use." *See, e.g.*, 15 U.S.C. § 1064(5)(A). This requirement is intended "to protect the public from being misled." *Midwest Plastic Fabricators, Inc. v. Underwriters Labs. Inc.*, 906 F.2d 1568, 1572 (Fed. Cir. 1990) (citation omitted). Certification-mark applicants have "an affirmative obligation… to monitor the activities of those who use the mark," and to take "reasonable steps, under all the circumstances" to ensure that the mark is used only in connection with those things it purports the mark represents. *Id.* at 1572 (citations omitted). Moreover, where "the owner of the mark has, implicitly or explicitly, given permission to others to use the mark without ensuring that their products or services meet the

certification mark owner's standards," the owner has not exercised the necessary control. *Swiss Watch*, 2012 WL 504693, at *7. *See also* MCCARTHY, *supra*, § 19:92 (5th ed. 2016).

The Consortiums have run afoul of the control requirement in two separate ways. First, they have allowed "gruyere" to be used on massive amounts of U.S.-produced cheese. As explained above, the Swiss Consortium allows Emmi Roth to produce unlimited amounts of U.S. gruyere for private-label customers. (SUMF ¶¶ 17-20.) As a result, ███████████████████

████████████████████████████████████████████████████████████

███████. (SUMF ¶ 19.) This is exactly what *Swiss Watch* described—"the owner of the mark has, implicitly or explicitly, given permission to others to use the mark without ensuring that their products or services meet the certification mark owner's standards"—and, in and of itself, disqualifies gruyere from being registered as a certification mark. *Swiss Watch*, 2012 WL 504693, at *7; *see also* MCCARTHY, *supra*, § 19:92.

Second, the Consortiums' control efforts have been inadequate and ineffective. The Consortiums have even been inconsistent among themselves. The Swiss Consortium claimed for years that gruyere could be produced only in Switzerland, going as far as demanding in one instance that a website be changed "to not refer to cheeses of… French… as 'GRUYERE.'" (Sweeney Decl. Ex. 2, GRUY-355. *See also id.*, GRUY-371, -425, -427, -438, -447, -486.) Indeed, before filing its immediate application, the Swiss Consortium told the USPTO that gruyere "originates in the Gruyére region *of Switzerland;*" France was not included. (Sweeney Decl. Ex. 8, GRUYERE-EDVA-9735.) It wasn't until the trademark application at issue was filed that the two Consortiums were aligned. This inconsistency defeats the purpose of a certification mark, which is intended "to prevent the public from being misled." *Midwest Plastic*, 906 F.2d at 1572.

29

Despite their missions, the Consortiums' efforts to enforce certification standards are woefully incomplete. The Consortiums have failed to challenge or change the gruyere food standard of identity in 21 C.F.R. § 133.149. (SUMF ¶ 28(a); or Harmonized Tariff Schedule's gruyere category. (*See, e.g.*, Sweeney Decl. Ex. 15, Resp. to RFP No. 73.) Despite some efforts to control industry use through cease-and-desist letters, those efforts appear to have stopped since 2017. And the record contains no evidence that the French Consortium has ever attempted to control use of the term in the U.S.

And the Consortium's modest efforts have been ineffective. As explained above, at least the following major stakeholders in the industry have rejected the Consortiums' control efforts: Boar's Head/Frank Brunckhorst; Dairyfood USA; Dietz & Watson; Finlandia; Foodworks; Intersource; Red Apple; Trader Joe's; Wegmans; and Wood River Creamery/Burnett Dairy, which stopped but then *resumed* selling gruyere. (SUMF ¶ 22.)

These efforts are not reasonable and, indeed, are contrary to the purpose of a certification mark: to protect the public from being misled. The Court should therefore hold that the Consortiums failed to control gruyere, and therefore cannot register the mark.

<u>**CONCLUSION**</u>

For the reasons above, the Court should grant summary judgment for the Opposers, dismissing the Consortiums' claims in their Amended Complaint, granting Opposers' counterclaims in their Answer and Counterclaims, affirming the August 5, 2020, decision of the Board, and ordering the USPTO to refuse registration of U.S. Trademark Application No. 86/759,759.

Date: March 29, 2021                     Respectfully submitted,

                                         By Counsel:

                                         ___/s/ Robert Powers___

30

Robert Powers
Zachary Miller
MCCLANAHAN POWERS, PLLC
8133 Leesburg Pike, Suite 130
Vienna, VA 22182
Telephone: (703) 520-1326
Facsimile:  (703) 828-0205
Email: rpowers@mcplegal.com
       zmiller@mcplegal.com
       pghale@mcplegal.com

Brian G. Gilpin *(pro hac vice)*
Zachary R. Willenbrink *(pro hac vice)*
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Telephone:  414-273-3500
Facsimile:  414-273-5198
Email: bgilpin@gklaw.com
       zwillenbrink@gklaw.com

Jennifer L. Gregor *(pro hac vice)*
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703-3300
Telephone:  608-257-3911
Facsimile:  608-257-0609
Email: jgregor@gklaw.com

*Counsel for Defendants*

31

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing document via CM/ECF.

Date:  March 29, 2021                                                By: /s/  Robert Powers
                                                                                          Robert Powers

24914319.15