# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

**Interprofession du Gruyère, et al.,**

Plaintiffs,

-against-

**U.S. Dairy Export Council, et al.,**

Defendants.

Civil Action No.
1:20-cv-01174-TSE-TCB

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# Table of Contents

Table of Authorities ……………………………………………………………………iii
I.    STATEMENT OF FACTS ............................................................................................... 2
   Traditional methods of making GRUYÈRE cheese. ............................................... 2
   The GRUYÈRE mark in the United States........................................................... 4
   Names used by U.S. cheese producers for "Alpine-style" cheese............................ 5
   Cheese producers in Europe (outside of Switzerland and France) have
   virtually stopped using Gruyère as a name for cheese........................................... 6
   Cheese competitions in the United States .......................................................... 7
   The Protected Designation of Origin (PDO) and Protected Geographical
   Indication (PGI) in Europe ........................................................................... 8
   Process for Granting of PDO Designation in Switzerland ...................................... 9
   PDO and PGI procedures in France.................................................................. 9
   U.S. consumers will be confused if GRUYÈRE is not protected............................. 10
II.   ARGUMENT ................................................................................................11
   A.   Governing Legal Standards................................................................11
   B.   Defendants have not sustained their heavy burden......................................... 13
      1.   FDA standards do not "allow Gruyere to be produced
      anywhere." ...................................................................................... 16
      2.   Defendants falsely claim that IDG "acquiesced to massive
      amounts of generic use of 'gruyere.'"...................................................... 19
      3.   Defendants' exaggerate the availability of non-Swiss
      GRUYÈRE......................................................................................... 21
      4.   The "GRUYÈRE" category in U.S. and international cheese
      contests does not include non-Swiss, non-French cheese.................................. 22
      5.   Numerous dictionaries and other authorities show that
      GRUYÈRE is not generic; Defendants' dictionary evidence is at best
      ambiguous ........................................................................................ 22
      6.   Internet evidence does not "demonstrate that gruyere can be
      produced anywhere." ......................................................................... 24
      7.   Defendants' calculations of the amount of non-Swiss and non-
      French cheese is misleading................................................................... 25
III.  STATEMENT OF FACTS IN DISPUTE.......................................................... 25
IV.   STATEMENT OF CONTROVERTED FACTS ................................................. 26
V.    CONCLUSION................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*America Online, Inc. v. AT & T Corp.*,
   64 F. Supp. 2d 549 (E.D. Va. 1999) ...................................................................14

*America Online, Inc. v. AT & T Corp.*,
   243 F.3d 812 (4th Cir. 2001) .............................................................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................12

*B & B Hardware, Inc. v. Hargis Industries, Inc.*,
   575 U.S. 138 (2015).............................................................................................11

*Berner International Corp. v. Mars Sales Co.*,
   987 F.2d 975 (3d Cir. 1993)...............................................................................14

*Community of Roquefort v. William Faehndrich, Inc.*,
   198 F. Supp. 291 (S.D.N.Y. 1961) ....................................................................17

*In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*,
   230 U.S.P.Q. 131 (T.T.A.B. 1986) .....................................................................16

*In re Dakota Cub Aircraft, Inc.*,
   Ser. No. 78705733, 2009 WL 1017276 (T.T.A.B. Mar. 25, 2009) .........................24

*Dulaney v. Packaging Corp. of America*,
   673 F.3d 323 (4th Cir. 2012) .............................................................................12

*Express Homebuyers USA, LLC v. WBH Marketing Inc.*,
   323 F. Supp. 3d 784 (E.D. Va. 2018) ................................................................13

*Express Homebuyers USA, LLC v. WBH Marketing Inc.*,
   791 Fed. App'x 396 (4th Cir. 2019)...................................................................13

*F.T.C. v. Ross*,
   08-CV-3233 (RDB), 2012 WL 2126533 (D. Md. June 11, 2012).........................12

*George & Co. v. Imagination Entertainment Ltd.*,
   07-CV-0498 (LMB)(TRJ), 2008 WL 2883771 (E.D. Va. July 25, 2008),
   *aff'd* 575 F.3d 383 (4th Cir. 2009) ....................................................................15

*Hoover Co. v. Royal Appliance Manufacturing Co.*,
   238 F.3d 1357 (Fed. Cir. 2001)..........................................................................11

*In re Hikari Sales USA, Inc.*,
  Ser. No. 86439012, 2019 WL 1453259 (T.T.A.B. Mar. 29, 2019) ........................................16

*Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.*,
  240 F.3d 251 (4th Cir. 2001) ........................................................................................16

*Information Clearing House, Inc. v. Find Magazine*,
  492 F. Supp. 147 (S.D.N.Y. 1980) ................................................................................15

*Institut National Des Appellations D'Origine v. Vintners International Co.*,
  958 F.2d 1574 (Fed. Cir. 1992)......................................................................................18

*James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.*,
  11-CV-1309 (DOC)(ANx), 2013 WL 655314 (C.D. Cal. Feb. 21, 2013) ..............................15

*Luxco, Inc. v. Consejo Regulador Del Teuquila, A.C.*,
  121 U.S.P.Q.2d 1477 (T.T.A.B. 2017) ....................................................................... *passim*

*M & G Electronics Sales Corp. v. Sony Kabushiki Kaisha*,
  250 F. Supp. 2d 91 (E.D.N.Y. 2003) ..............................................................................15

*Magic Wand, Inc. v. RDB, Inc.*,
  940 F.2d 638 (Fed. Cir. 1991).......................................................................................14

*National Federation of the Blind, Inc. v. Loompanics Enterprises, Inc.*,
  936 F. Supp. 1232 (D. Md. 1996)..............................................................................11, 24

*Network Automation, Inc. v. Hewlett-Packard Co.*,
  08-CV-4675 (JFW)(RZx), 2009 WL 5908719 (C.D. Cal. Sept. 14, 2009) ...........................15

*Pom Wonderful LLC v. Coca-Cola Co.*,
  573 U.S. 102 (2014)................................................................................................ 17-18

*Retail Services, Inc. v. Freebies Publishing*,
  364 F.3d 535 (4th Cir. 2004) ........................................................................................13

*Sanyo Watch Co. v. Sanyo Electric Co.*,
  691 F.2d 1019 (Fed. Cir. 1982)......................................................................................11

*Selchow & Righter Co. v. Decipher, Inc.*,
  598 F. Supp. 1489 (E.D. Va. 1984) ................................................................................14

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
  987 F. Supp. 2d 1023 (C.D. Ca. 2013) ...........................................................................15

*Swiss Watch International, Inc. v. Federation of the Swiss Watch Industries*,
   101 U.S.P.Q.2d 1731 (T.T.A.B. 2012) ................................................................11

*Tea Board of India v. Republic of Tea, Inc.*,
   80 U.S.P.Q.2d 1881 (T.T.A.B. 2006) ........................................................ *passim*

*U.S. Search, LLC v. U.S. Search.com Inc.*,
   300 F.3d 517 (4th Cir. 2002) ............................................................................14

## STATUTES

15 U.S.C. § 1054 ....................................................................................................1

15 U.S.C. § 1071 ....................................................................................................1

21 U.S.C. § 343 ....................................................................................................17

21 C.F.R. § 133 ....................................................................................................21

21 C.F.R. § 133.10 ...............................................................................................16

## RULE

Fed. R. Civ. P. 56 .................................................................................................12

## TREATISES

Charles Alan Wright, Arthur R. Miller,
   *Federal Practice & Procedure* (4th ed. 2020) ...............................................12

J. Thomas McCarthy,
   *McCarthy on Trademarks & Unfair Competition* (5th ed. 2019) .................... *passim*

## MISCELLANEOUS

Deborah Jay, *Genericness Surveys in Trademark Disputes: Evolution of Species*,
   99 Trademark Rep. 1118 (Sept.-Oct. 2009) ....................................................14

GRUYÈRE cheese – "widely considered among the greatest of all cheeses" – has been made in the mountainous GRUYÈRE region of western Switzerland and east-central France since 1115 AD. It is painstakingly made from local, natural ingredients using traditional methods that assure the connection between the geographic region and the quality and characteristics of the final product. The entire process is subject to certification by Plaintiffs, Interprofession du Gruyère ("IDG") and Syndicat Interprofessionel du Gruyère ("SIG").

Plaintiffs applied to register GRUYÈRE as a certification mark under 15 U.S.C. § 1054. Although the United States Patent and Trademark Office ("USPTO") approved the application, Defendants filed Oppositions in the USPTO's Trademark Trial and Appeal Board ("the Board").

On August 5, 2020, the Board issued a decision which wrongly held that GRUYERE is a generic term. The Board made numerous factual and legal errors, including concluding that, based on FDA regulations, U.S. cheese makers are "required" to use the term GRUYÈRE. That was a clear error, since Defendants have admitted in their answer that "there is no requirement that any cheese maker use the name GRUYÈRE and admit that the Board does not cite a case where the FDA has required anyone to use 'Gruyère' on cheese." (Dkt  # 35, ¶ 29). The Board also ignored its own precedent, which holds that a mark is not generic unless it has "lost all significance as a mark." *Tea Bd. of India v. Rep. of Tea, Inc.*, 80 U.S.P.Q.2d 1881, 1888 (T.T.A.B. 2006).[1] Plaintiffs filed this civil action under 15 U.S.C. § 1071(b), challenging the Board's decision. Since the Board's decision cannot stand, the mark should be registered.

On this motion, Defendants have the burden of showing no genuine issue as to whether GRUYÈRE is generic; that is, whether the majority of cheese buyers and consumers believe

---

[1] Other errors in the Board decision are listed in Lehv Dec. Ex. 1. Unless otherwise noted, "Ex." refers to exhibits to Lehv Dec.

"Gruyere" is a type of cheese that can be made anywhere, as opposed to a cheese made in Switzerland and France. Although the issue turns on consumer beliefs, Defendants offer no consumer testimony or consumer survey, thus utterly failing to meet their burden.

## I.  STATEMENT OF FACTS

**Traditional methods of making GRUYÈRE cheese.**

The name GRUYÈRE derives from the area of Switzerland where it was first made: the district of La Gruyère in the Canton of Fribourg. The area of production has since been expanded to include neighboring areas of France. (Ex. 2 ¶ 2).

GRUYÈRE cheese is made by traditional methods, passed down from generation to generation, using only local ingredients. These ingredients and methods, along with expertise of its makers, give GRUYÈRE cheese its unique, inimitable, and sought-after flavor and quality. The procedure for making GRUYÈRE cheese is precisely specified and strictly controlled. Three groups in the region are involved: dairy farmers (who produce the milk), cheesemakers (who turn the milk into cheese), and "affineurs" (who age or mature the cheese). (Ex. 2¶ 3). Since 1981, the Swiss specifications (Ex. 3), have been officially approved by the Swiss Federal Office for Agriculture. The French specifications for GRUYÈRE cheese, as well as the precise areas of France where it may be made, are similar. (Ex. 4).

Several factors contribute to the flavor, texture, color, and aroma of GRUYÈRE cheese. The first is the milk. The cows are fed solely on natural forage – fresh grass in summer and hay in winter, with no additives or silage. No antibiotics or growth hormones may be used. The milk is never pasteurized. The alpine grasses and the micro-organisms present in raw milk impart flavor to the cheese. Pasteurization, which involves heating the milk to high temperatures, would

destroy these flavors. (Ex 2 ¶ 4).[2]

Twice a day, in the morning and in the evening, each milk producer delivers milk to its assigned cheese dairy. The morning milk is merged in a copper vat with the evening milk, which was left to settle all night. The cheesemaker adds starter cultures, made from whey, to mature the milk. Then he or she adds rennet, to curdle the milk. After 35 to 40 minutes, the milk in the copper vat has turned into a dense mass. Because the milk was not heated before the curdling, it maintains all of its flavor and aromas. The copper vats add to the flavor. (Ex 2 ¶ 5).

This curd mass is then cut into granules using large knives called "cheese harps." Then the contents of the vats are gradually heated to 57° C (135°F) for 40-45 minutes. (Ex 2 ¶ 6). Once that temperature is reached and the granules are the size of wheat grains, the cheesemaker takes a handful of grains and carefully kneads them into a mass to check the texture. The contents of the vat (grainy curds and whey) are then pumped out into round molds. Each mold is marked on its outer edge (which is called the "heel") with the GRUYÈRE name, along with the number of the cheese dairy. The whey drains from the molds and is collected in a large basin underneath. Each wheel is then pressed for about twenty hours, with an applied force of up to 900 Kilograms or 1,980 pounds. (Ex 2 ¶ 7).

The following day, the cheesemaker removes each wheel from the mold and puts the wheels in a concentrated salt bath or brine for 24 hours. Then the wheels are stored for three months in the cheesemaker's cellar. They are given almost daily care, to help form of a fine protective rind. The cheese maturers rub the cheese with a mixture of local, natural microflora, salt, and water,

---

[2] In France, the mountainous areas are similar. The local, varied, and natural plants promote the development of aromatic compounds in the cheese. As the French specifications state, "The aromatic richness of the natural prairie flora finds its way into the cheeses through the milk's own microflora." (Ex. 4).

called a "smear" (or "morge" in French). The smear – and the flavors it imparts – is another link between the environment of the Gruyère region and the final cheese product. (Ex 2 ¶ 8).

After three months, the wheels leave the cheese dairy to be stored in the *caves d'affinage* (maturing cellars) for a slow maturation process in a 90% humidity environment and a temperature of 15°C (59°F). The wheels are turned over and brushed with salt water. The affinage lasts five to eighteen months. (Ex 2 ¶ 9).

GRUYÈRE cheese is aged for at least five months before it is offered for sale, allowing. the characteristic GRUYÈRE flavor to emerge. Younger GRUYÈRE cheeses have a softer texture and a milder taste than cheeses that have been aged longer. Aged GRUYÈRE can be described as nutty, earthy, and fruity, with a balance of sweetness (like caramel) and saltiness. The texture is firm and dense, with small crystals that form during the aging process. The color is pale cream, and the cheese generally does not have holes. (Ex 2 ¶ 10).

GRUYÈRE cheese is subject to rigorous inspection as part of the Swiss certification process. A first assessment is carried out at after three-months, when the cheese leaves the cheesemaker's cellars to be sent to the affineur. The assessment is carried out by a committee composed of an appraisal officer from IDG and an expert cheesemaker. Appeals can be made, to the Board of Appeal, composed of two representatives of the affineurs and a cheesemaker. The final assessment is made when the cheese leaves the affineurs, to be distributed and sold to the public. (Ex 2 ¶ 11). GRUYÈRE cheese produced by one of IDG's members won the title "Best Cheese In The World" at the World Cheese Awards four times: in 1992, 2002, 2005 and 2015, the only cheese ever to have done so. (Ex 2 ¶ 12).

**The GRUYÈRE mark in the United States.**

IDG exhibits GRUYÈRE cheese at the Specialty Food Association's Summer Fancy Food Show, the largest specialty food industry event in North America; and the Specialty Food

Association's Winter Fancy Food Show. IDG's President regularly attends the Summer show, where he meets retailers, distributors, and members of the food service industry. Except for GRUYÈRE cheese from Switzerland, no exhibitor at either show offers cheese under the Gruyère name.  IDG's President also regularly visits U.S. retail stores that sell GRUYÈRE, where he speaks to retailers and consumers. Consumers he speaks to know that GRUYÈRE is made in Switzerland and has a unique and distinctive flavor. They do not use GRUYÈRE to refer to non-Swiss, non-French cheese. (Ex 2 ¶ 13).

IDG distributes in the United States brochures and recipes to promote the GRUYÈRE mark. GRUYÈRE cheese is also featured on IDG's international GRUYÈRE website (www.gruyere.com), available in English, and on the "Cheeses from Switzerland" website (www.cheesesfromswitzerland.com).

IDG collaborates in the U.S. with Swiss Tourism, which promotes tourism in Switzerland to U.S. travelers through the website www.myswitzerland.com. IDG also collaborates with Swiss International Airlines, by providing samples of GRUYÈRE cheese on flights to and from Switzerland. IDG is featured on the website www.myswitzerland.com/en-us/home.html, a website that promotes tourism in Switzerland. (Ex 2 ¶ 15). IDG works with radio stations in New York, San Francisco, Philadelphia, Boston and Miami, where it has co-sponsored talks about recipes featuring GRUYÈRE cheese.

**Names used by U.S. cheese producers for "Alpine-style" cheese.**

Cheesemakers in the U.S. know that GRUYÈRE should be used only for cheese made in the Gruyère region, and not on cheese made in the U.S. IDG actively educates U.S. cheesemakers, retailers, and consumers that GRUYÈRE may be used only on cheese produced in the Gruyère region. Emmi Roth (aka Roth Cheese) ("Roth"), the largest and only significant U.S. producer of what used to be called "domestic Gruyère," now uses GRAND CRU ORIGINAL, GRAND CRU

RESERVE, and GRAND CRU SURCHOIX as the names of the cheeses it formerly called "Gruyère." (Ex. 5).

In response to a request from IDG, Wisconsin Milk Marketing Board ("WMMB") revised its website, which promotes cheese made in Wisconsin. The website no longer uses GRUYÈRE. Instead, it uses "Alpine Style." (Ex. 6). Significantly, WMMB did *not* oppose the application to register GRUYÈRE.

Smaller cheese producers use the designations "alpine-style" or "mountain-style" or use fanciful names for their cheese. (Ex 2 ¶ 19-20). Uplands Cheese Company, in Wisconsin, uses the name Pleasant Ridge Reserve for its "aged, alpine-style cheese." According to the Uplands website, Pleasant Ridge "won Best of Show in the American Cheese Society's annual competition three times (2001, 2005 and 2010), and having also won the US Cheese Championships in 2003. It is the only cheese to have won ACS Best of Show three times, and the only cheese to have ever won both of the major, national cheese competitions." (Ex. 7).

Another prize-winning cheese maker, Consider Bardwell Farm, in Vermont, uses the names RUPERT and RUPERT RESERVE for its aged alpine-style cheese. Jasper Hill Farm, in Vermont, uses the name Alpha Tolman. This farm won best in show in the 2018 American Cheese Society competition. Spring Brook Farm, in Reading, Vermont, uses the name Tarentaise Reserve. (Ex 2 ¶ 21-23). Arethusa Farms, a successful dairy in Connecticut, sells its "alpine-style" cheese under the name Mt. Tom. (Ex 2 ¶ 24; Ex. 8,9).

**Cheese producers in Europe (outside of Switzerland and France) have virtually stopped using Gruyère as a name for cheese.**

Defendant Atalanta Corporation purchases cheese from a German company named Ammerland Dairy. The Ammerland Dairy Company changed the name of its cheese from "Ammerlander Gruyère" to "Ammerlander Alpine." (Ex. 10, 11).

Some retailers in the U.S. have sold cheese made in Wisconsin, Germany, and Austria under the "Gruyère" name. IDG's lawyers have written to these retailers to object to their misuse of GRUYÈRE. Although not every retailer has complied, the following major retailers have stopped using "Gruyère" for their private label cheese: Whole Foods, ConAgra Foods, Ralph's Supermarkets, Balducci's, Zabar's, Fairway Markets, Westside Markets, Pacific Cheese, Keystone Farm, LLC, Swiss-American, Inc., Rockhill Mountain Creamery, Rumiano Cheese Co., Burnett Dairy Cooperative (which supplies Costco), Chaseholm Farm Creamery, Peterson Company, Mandi Foods, Food Innovations, Inc., Cheezwarehouse.com, Inc., Kemco Foods Distributors, Caputo Cheese Market, and Mondo Projects, Inc. (Ex 2 ¶ 26; Sweeney Dec. Ex. 2)). (Applicants' Trial Exhibit 6). Included is IDG's attorneys' letter to WMMB and its response.

Many of the sellers who have not agreed to stop using GRUYÈRE have acknowledged Plaintiffs' pending Application, and said they would reconsider if a registration were issued. With a limited litigation budget, Plaintiffs reserved their rights. (Ex 2 ¶ 27).

**Cheese competitions in the United States**

The Wisconsin Cheese Makers Association runs the World Championship Cheese Contest every two years. In the 2018 Contest, the category that includes "alpine style" cheeses made in the U.S. is called "Washed Rind/Smear Ripened Hard Cheeses." No cheeses in this category use the name Gruyère. (Ex. 12, 13). The contest also has a category called "Gruyere," limited to cheeses sold under the mark GRUYÈRE. (Ex. 14, 15). All but one of the cheeses in this category are produced in Switzerland and entitled to use the GRUYÈRE mark. The one exception is a Danish cheese made by Bornholms Andelsmejeri. Defendants offer no evidence that this Danish cheese is sold in the U.S. In short, among the hundreds of entrants in the World Championship Cheese Contest, *no cheese made in the U.S. uses the name Gruyère*, and, with one minor exception, all the cheeses that use the name GRUYÈRE are *made in Switzerland*. Significantly,

the Wisconsin Cheese Makers Association, like the WMMB, did *not* oppose Plaintiffs' application to register GRUYÈRE.

Similarly, in the American Cheese Society 2018 competition (a competition limited to U.S. made cheese), not one of the 365 cheeses was called "Gruyere." Instead, cheeses in the "washed rind" category used fanciful names for their cheeses. (Ex 2 ¶ 29, Ex. 16, 17).

**The Protected Designation of Origin (PDO) and Protected
Geographical Indication (PGI) in Europe**

In 1981, the Federal Council of Switzerland issued a "Decree on the protection of the names of Swiss Cheeses." This regulation listed GRUYÈRE as a protected designation, among twelve other cheeses, and defined the production requirements for GRUYÈRE cheese. This protected designation remained in effect until superseded by the Protected Designation of Origin for GRUYÈRE in 2001.  (Ex. 18 ¶ 4-5).

Protected Designation of Origin ("PDO") and Protected Geographical Indication ("PGI") are used for agricultural products traditionally produced in a particular geographic region. When used on a product, PDO and PGI designations guarantee that the product originates in the specific region and follows a traditional production process. PDO (or *Appellation d'origine protégée* ("AOP") in French) certifies the strongest link to the territory. It requires that the product come from a particular region, that the product's "quality or characteristics are essentially or exclusively due to a particular geographical environment with its inherent natural and human factors," and that *all* aspects of production, processing, and preparation originate from that region. PGI (or *Indication géographique protégée* ("IGP") in French) certifies the local know-how and the close link between the product and the place or region, and *at least one* stage of production, processing or preparation must take place in the region. (Ex. 18 ¶ 6).

These designations highlight the qualities and traditions associated with registered products. They assure consumers that these are genuine products, not imitations seeking to benefit from the reputation of the original. (Ex. 18 ¶ 7).

**Process for Granting of PDO Designation in Switzerland**

The PDO designation is granted under the following procedures. Initially, Swiss producers in the region agree on precise specifications for the ingredients and processes involved in making the product. They will then seek protection at the national level in Switzerland. If the designation is protected at the national level, the producers or the state (that is, Switzerland) may then submit an application to the European Commission. The Commission examines may or may not approve the application. The Commission will not approve the application if the term is a generic term. Under EU rules, generic terms are "names of products which, although relating to the place, region or country where the product was originally produced or marketed, have become the common name of a product in the [European] Union." For example, Cheddar cheese was deemed to be a generic name in the EU. Other cheese terms that have been held generic in the EU are Brie, Camembert, Edam, Emmentaler, and Gouda. (Ex. 18 ¶ 14-15). GRUYÈRE was approved as a PDO in Switzerland in 2001, and then in 2011 recognized in an agreement between the EU and Switzerland for the entire EU. (Ex. 18 ¶ 17).

**PDO and PGI procedures in France**

In France, the PDO and PGI designations are under the jurisdiction of the French National Institute of Origin and Quality (or *Institut national de l'origine et de la qualité* ("INAO"). For the past eighty years, INAO has used its expertise to insure the recognition and protection of indications of quality and origin of agricultural and food products. (Ex. 19 ¶1-2).

In France the indications include *appellation d'origine contrôlée* (AOC), protected designation of origin (PDO), and protected geographical indication (PGI). (Ex. 19 ¶ 3). A French

application was made in 2010 to register GRUYÈRE as a PGI. The United States Dairy Export

Council – one of the Defendants here– filed an Opposition on the ground that the term is generic,

but the opposition was overruled and the application was granted. GRUYÈRE has been a PGI

designation for cheese produced in a limited area of France since 2012. (Ex. 19 ¶ 6).

**U.S. consumers will be confused if GRUYÈRE is not protected.**

Defendants have submitted evidence of *only four* makers of cheese sold under the name

"Gruyère" in the U.S. but not made in Switzerland or France. These are:

(1) Roth in Wisconsin in 2013 *stopped* using GRUYÈRE as the name for cheese it sells

under its own brand. (Ex. 2 ¶ 17). Although Roth continues to sell cheese in bulk to retailers and

distributors, some of whom continue to label the cheese as "Gruyère," Roth does not call this

cheese "Gruyere." It calls it "Grand Cru." Moreover many of the retailers have also stopped

using the name "Gruyère," or are waiting for the outcome of this case. (Ex. 2 ¶ 26-27);

(2) Ammerland in Germany, which stopped using the name "Gruyère," and which now calls

the cheese "Alpine Style." (Ex. 2 ¶ 25); and

(3) A supplier in Austria that sells cheese to Atalanta, which Atalanta sells under the name

"Alps Gruyere." Atalanta's labels do not even mention that the cheese is made in Austria, except

in small print on the back of the package.

(4) Defendants assert that Glanbia Nutritionals makes a cheese called "Gruyere," but they

have not provided any evidence that this cheese is labeled "Gruyere" when sold to consumers.

Based on the experience of IDG's President, U.S. consumers know that GRUYÈRE cheese

is made in Switzerland or France, and know its unique taste. Indeed, there has been actual

confusion as a result of the use of GRUYÈRE for cheese made in Wisconsin. An Internet blog

post, written by an experienced food writer, says, "I went to Trader Joe's and picked up two

packages of Gruyere: one was a Swiss Gruyere aged at least six months and the other was a

Swiss Gruyere aged for at least a year." (Ex. 20, Page 2-3). However, the "six month" cheese was in fact made in Wisconsin, not Switzerland. (*Id.*)

## II. ARGUMENT

Defendants say that a term is generic if its "primary significance" is an "indication of the nature or class of the product or service, rather than an indication of source" (D. Mem. 11), but they don't say what "primary significance" means. It means this: "The party seeking to prove a mark is generic must show, in the minds of *a majority* of the usual customers or other relevant members of the public" that the term primarily signifies the product, not the producer. *Nat'l Fed'n of the Blind, Inc. v. Loompanics Enters., Inc.*, 936 F. Supp. 1232, 1247 (D. Md. 1996), citing 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 12:6 (5th ed. 2019) (hereinafter "*McCarthy*"). As Prof. McCarthy explains, "**Majority Usage Controls**. If some people regard the contested designation as a generic name, while others regard it as a mark, the term must be placed either in the 'generic' pigeonhole or in the 'trademark' category. The result of the primary significance rule is that majority usage controls." (*Id.*; emphasis in original). Moreover, Defendants ignore the test used in TTAB, namely, whether the term has "lost all significance as a mark." *Tea Bd. of India*, 80 U.S.P.Q.2d at 1888; *Swiss Watch Int'l, Inc. v. Fed'n of the Swiss Watch Indus.*, 101 U.S.P.Q.2d 1731, 1743-44 (T.T.A.B. 2012).

### A. Governing Legal Standards

Defendants bear the burden of showing that GRUYÈRE is a generic term. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015) ("The party opposing registration bears the burden of proof . . . and if that burden cannot be met, the opposed mark must be registered, see 15 U.S.C. § 1063(b)."); *Sanyo Watch Co. v. Sanyo Electric Co.*, 691 F.2d 1019, 1021 (Fed. Cir. 1982); *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1360 (Fed. Cir. 2001). Since a

genericness finding would be result in a forfeiture of rights, Defendants bear the burden of showing genericness by "persuasive and clear evidence." 2 *McCarthy* § 12:12.

Summary judgment must be denied if there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The court must view all facts and draw all reasonable inference "in the light most favorable to the non-moving party," *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 324 (4th Cir. 2012). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)

On their motion, Defendants must show that there is no genuine issue of fact that GRUYÈRE has "lost all significance as a mark" or, at the very least, that a majority of consumers think of it as a generic term. But Defendants have offered no evidence as to what *any* consumer thinks about GRUYÈRE, let alone a majority of consumers.

Defendants suggest that this court "should resolve this dispute on summary judgment" because "[n]either party has made a jury demand, thus any trial would be to the Court." This suggestion is directly contrary to Rule 56. On summary judgment, the judge's role is to determine whether there is a genuine dispute of fact, unlike at trial, where the judge's role is make factual determinations. *Waterkeeper Alliance, Inc. v. Alan & Kristin Hudson Farm*, 10-CV-0487 (WMN), 2012 WL 13005672, at *1 (D. Md. Mar. 1, 2012) ("[I]it might appear that the Court could resolve the dispute at this stage and spare the parties the expense of further litigation. The Court's role, however, in deciding a motion for summary judgment is significantly different than its role would be in a bench trial.") ; *see F.T.C. v. Ross*, 08-CV-3233 (RDB), 2012 WL 2126533, at *4 (D. Md. June 11, 2012) (same); *see also* 10A Charles Alan Wright, Arthur R. Miller, Federal Practice & Procedure § 2712 (4th ed. 2020) ("[S]ummary judgment is not a

substitute for the trial of disputed fact issues. Accordingly, the court cannot try issues of fact on a Rule 56 motion but only is empowered to determine whether there are issues to be tried").

Although Defendants cite decisions granting summary judgment on genericness, those cases had one-sided facts. In *Express Homebuyers USA, LLC v. WBH Marketing Inc.*, 323 F. Supp. 3d 784, 791 (E.D. Va. 2018) (Ellis, J.), the alleged mark was the commonplace phrase "we buy houses." The owner of the "mark" "actively encouraged other house-buying companies—many of which had names containing the phrase "We Buy Houses"—to use the phrase 'we buy houses,' believing that increased use of the phrase would create more traffic to the WEBUYHOUSES.COM website" and "advertised and marketed the Marks in a non-source-identifying manner, saying that 'we buy houses' doesn't signify who you are. It signifies what you do." *Id.* at 788. In *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535 (4th Cir. 2004), *abrogated on other grounds by Express Homebuyers USA, LLC v. WBH Marketing Inc.*, 791 Fed. App'x 396 (4th Cir. 2019), the owners of alleged mark "freebies" confirmed "that their use of the term 'freebies' was consistent with the commonly understood meaning of the word, referring to free goods and services," and dictionary definitions "were roughly uniform in defining 'freebie' as a slang term meaning 'something ... given or received without charge.'" *Id.* at 544, 545. Here, in contrast, the evidence is not one-sided, and summary judgment for Defendants is precluded.

## B. Defendants have not sustained their heavy burden.

As Defendants admit, whether a mark is generic is a question of fact. (D. Mem. 11). Yet Defendants have not explained how this Court can say there is no genuine issue as to the "primary significance" in the minds of a majority of consumers. And although Defendants claim the court can consider "any competent source" of evidence (D. Mem. 12), the evidence they submit must show that there is no dispute as to what a majority of consumers think. "Many types of evidence may be proffered in trademark disputes on the issue of whether a mark is or has

become generic. However, surveys (opinion polls) that measure the 'primary significance' of a mark to consumers are 'almost de rigueur' in such inquiries." Deborah Jay, Genericness Surveys in Trademark Disputes: Evolution of Species, 99 Trademark Rep. 1118, 1119 n.4 (Sept.-Oct. 2009) (quoting 2 *McCarthy* § 12:14). See also, *McCarthy* § 32:195 ("Some judges have an expectation that a survey will be introduced to aid the court in determining customers' state of mind."). "In fact," Deborah Jay says, "the failure of a party who is alleging a mark has become generic to conduct a survey may result in a negative inference." Genericness Surveys, 99 Trademark Rep. at 1120.

Thus, numerous cases have rejected claims of genericness that were not backed up by a survey. *Berner Int'l Corp. v. Mars Sales Co*., 987 F.2d 975, 982-83 (3d Cir. 1993) (on genericness, "direct consumer evidence, e.g., consumer surveys and testimony is preferable to indirect forms of evidence," such as dictionaries, trade journals, and other publications, citing *McCarthy*); *Am. Online, Inc. v. AT & T Corp*., 64 F. Supp. 2d 549, 565 (E.D. Va. 1999), *aff'd in part, vacated in part on other grounds by* 243 F.3d 812 (4th Cir. 2001) ("[T]he Court would note that McCarthy recommends using consumer surveys as a means of determining whether the primary significance of a mark is generic."); *Selchow & Righter Co. v. Decipher, Inc.,* 598 F. Supp. 1489, 1504 (E.D. Va. 1984) (refusing to find TRIVIAL PURSUIT generic, in part, because "[t]he defendant failed to perform any statistical surveys concerning the possibility that the term TRIVIAL PURSUIT has become generic."); *Magic Wand*, *Inc.v. RDB, Inc.,* 940 F.2d 638, 641 (Fed. Cir. 1991) ("Magic Wand supplied no survey evidence of consumer understanding, no letters or testimony from consumers and no affidavits from consumers showing generic use or understanding of TOUCHLESS."); *U.S. Search, LLC v. U.S. Search.com Inc*., 300 F.3d 517, 526 (4th Cir. 2002) ("Survey evidence is generally thought to be the most direct and persuasive way

of establishing secondary meaning"); *George & Co. v. Imagination Entm't Ltd.*, 07-CV-0498 (LMB)(TRJ), 2008 WL 2883771, at *3 (E.D. Va. July 25, 2008), *aff'd* 575 F.3d 383 (4th Cir. 2009) ("Given that George bears the ultimate burden of proving a likelihood of confusion by a preponderance of the evidence, the lack of survey evidence, while not fatal, severely hampers George's ability to meet that burden.")

Failure to provide a survey may warrant an adverse inference against the party bearing the burden of proof, if the party had the financial means and enough time to conduct a survey. See, e.g., *Info. Clearing House, Inc. v. Find Magazine,* 492 F. Supp. 147, 160 (S.D.N.Y. 1980) ("[P]laintiff, though possessed of the financial means, did not undertake a survey of public consumer reaction to the products under actual market conditions. . . . . The absence of testimony from such customers invites an adverse inference."); *see also Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054 (C.D. Ca. 2013) (plaintiff's failure "to provide a consumer survey showing a likelihood of confusion . . . warrants a presumption that the results would have been unfavorable." (citations and internal quotation marks omitted); *James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.*, 11-CV-1309 (DOC)(ANx), 2013 WL 655314, at *9 (C.D. Cal. Feb. 21, 2013) (granting summary judgment in part because survey evidence is "often the most persuasive evidence" and a "plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable"); *Network Automation, Inc. v. Hewlett-Packard Co.*, 08-CV-4675 (JFW)(RZx), 2009 WL 5908719, at *10 (C.D. Cal. Sept. 14, 2009) (granting defendant's motion for summary judgment; "lack of survey evidence counts against finding actual confusion."); *M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 104 (E.D.N.Y. 2003)

(adverse inference against plaintiff for failure to "submit any survey evidence or testimony of customers to prove actual confusion.")

Defendant U.S. Dairy Export Council is large trade organization with hundreds of members. D. Mem. 1. Defendants have the collective resources and the time to conduct a survey – in addition to having the burden of proof. Their failure to offer a survey invites an inference that either they (1) tried to conduct a survey but obtained poor results or (2) did not bother to conduct a survey, believing it would be a waste of time.

Although Defendants cite cases (D. Mem. 13) in which a mark was held generic without a survey, those cases had one-sided facts. In *Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc*., 240 F.3d 251, 254-55 (4th Cir. 2001), the "mark" was the commonly-used term "crab house" for a seafood restaurant. In *In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*, 230 U.S.P.Q. 131, 132 (T.T.A.B. 1986), the Applicant admitted that "fontina" is an Italian word meaning "very soft, tender" and "fontina" is "type of cheese." In *In re Hikari Sales USA,Inc*., Ser. No. 86439012, 2019 WL 1453259, at *1 (T.T.A.B. Mar. 29, 2019), the mark was "algae wafers" for fish food wafers made of algae.

1. ***FDA standards do not "allow Gruyere to be produced anywhere."***

The Board's decision mistakenly relies on FDA "standards of identity" for certain cheese products. The Board quotes 21 C.F.R. § 133.10 for the propositions that FDA standards "prescribe the name for each such food' and that "[t]he act requires that this name appear on the label." But the phrase "each such food" in the FDA regulations refers to "foods made in part from cheese, including pasteurized process cheese; pasteurized process cheese with fruits, vegetables, or meats; pasteurized blended cheese; pasteurized process cheese food; pasteurized process cheese spread, and related foods." The Board simply misread the regulation, which requires that a maker of "process cheese," "blended cheese," "process cheese food," or "process

cheese spread" use *those terms* in its label. The statute does not require use of "gruyere" on cheese labels. Not even Defendants claimed that FDA regulations require any U.S. cheese manufacturer to use GRUYÈRE on labelling for cheese. Indeed, Defendants admitted in their Answer that there is no such requirement. See DKT # 35, ¶ 29 ("Defendants admit that there is no requirement that any cheese maker use the name GRUYÈRE.")

Section 343(g) of the Food, Drug, and Cosmetics Act, 21 U.S.C. § 343(g), provides the explanation. It says a food is "misbranded" if it uses a food name for which an FDA standard has been provided, unless the food meets that standard. In other words, if a cheese maker calls its cheese "gruyere," the cheese must be made in accordance with the standard. But the statute does not require anyone to use the name "gruyere." Indeed, many cheese makers use names such as "Grand Cru" or "Alpine style," all without objection from the FDA.

Even though Defendants admit in their Answer that no one is required to use the term "gruyere," they now falsely argue that the FDA "requires that this name appear on the label." (D. Mem. 14). They also falsely argue that the "FDA standard of identity . . . allows gruyere to be produced anywhere." (D. Mem. 13). The FDA standard does not "allow" any cheese "to be produced anywhere," and says nothing about the place of manufacture. If the Trademark Act precludes the use of GRUYÈRE on cheese made in Wisconsin, nothing in the FDA regulation overrules that.

Further, the FDA has no expertise as to how the public understands the names for which it has standards of identity. Indeed, it has a standard of identity for ROQUEFORT, yet the courts have said ROQUEFORT is not generic. *Cmty. of Roquefort v. William Faehndrich, Inc.*, 198 F. Supp. 291, 293 (S.D.N.Y. 1961). The U.S. Supreme Court has held that FDA regulations do not preclude a private right of action for infringement, *Pom Wonderful LLC v. Coca-Cola Co.*, 573

U.S. 102, 115 (2014) (FDA has limited "perspective or expertise in assessing market dynamics").

*Luxco, Inc. v. Consejo Regulador Del Teuquila, A.C.*, 121 U.S.P.Q.2d 1477 (T.T.A.B. 2017), concerned whether TEQUILA was a generic term or a valid certification mark. The opposer argued that the Treasury Department had exclusive authority over labelling of alcoholic beverages. The Board held that TEQUILA was not generic, that Treasury regulations do not "exceed[] or negate[] Applicant's certification mark rights under common law or as may be acknowledged by the USPTO under the Trademark Act," and that the Treasury Department has "no authority to make determinations as to trademark registrability under the Trademark Act." *Id.* at 1498. Defendants cite *Institut National Des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574 (Fed. Cir. 1992). But that court found the appellant had "acknowledge[d]" that CHABLIS is a generic term in the U.S.  958 F.2d 1581 n.5.

Finally, Defendants cite a recent USPTO exam guide (D. Mem. 14-15). This exam guide does not apply to certification marks, but to trademarks "for cheeses and processed meats in which the mark includes geographic wording (hereinafter 'geo-significant wording') that does not indicate geographic origin." Here, Plaintiffs' certification mark *does* indicate geographic origin. Further, the exam guide says "such geo-significant terms differ from certification and collective marks of regional origin, which are registrable under Trademark Act § 4, 15. U.S.C. § 1054." The exam guide also says, "The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended to provide clarity regarding existing requirements under the law or agency policies." Under existing law, FDA standards do not preclude registration of Plaintiffs' certification mark.

## 2. Defendants falsely claim that IDG "acquiesced to massive amounts of generic use of 'gruyere.'"

Defendants claim that Roth "produced—in Wisconsin—millions of pounds of cheese annually that is labeled as gruyere when sold to U.S. consumers," that IDG "essentially consented to this activity," and that IDG "condoned and acquiesced in the sale of domestically produced gruyere by Emmi Roth." (D. Mem. 15). See also D. Mem. 2 (Roth "annually produces millions of pounds of gruyere in Wisconsin that is labelled 'gruyere'").

In fact, Roth stopped using "Gruyere" on May 1, 2013, when it gave the cheese the new name, "Grand Cru." Since then, the amount of cheese Roth has sold that is labelled "Gruyere" is not "millions of pounds," as Defendants claim, but **zero** pounds.

Defendants know that when Roth sells its Grand Cru cheese in bulk to customers, such as supermarkets, that re-package and sell it as private label cheese, Roth does not call the cheese "Wisconsin made gruyere" or "Domestic private label gruyere." Defendants made up these terms. Roth calls the cheese "Grand Cru," not "Gruyere." See letter from Roth to Wegmans ("Emmi Roth USA, Inc. is proud to supply its award-winning, Wisconsin-made Grand Cru® and other domestic cheeses to Wegmans's, as well as our Swiss import products, in support of your private label program.") (Sweeney Dec. Ex. 12 (Dep. Ex. 31)). Defendants' repeated claim that Roth "annually produces millions of pounds of gruyere in Wisconsin that is labelled 'gruyere'" is *knowingly false*.

Moreover, Defendants took Roth's deposition in this action. (No Roth witness testified in the Board proceeding.) The Roth witness disclosed that the row on the spreadsheet at D. Mem. 16 entitled "Domestic Private Label Branded Gruyere" includes sales to two categories of customers. First, Roth sells to supermarkets and distributors that package the cheese under the supermarket's or distributor's own "private label." Some supermarkets call the cheese

"Gruyere," while others call it "Alpine style cheese," or something else. The Roth witness had no

idea how much cheese is sold by its customers under these various names:

> Q. So you don't know how much of this cheese . . . is actually
> labeled with the word Gruyère when it's sold to ultimate
> consumers?
> [Objection by Defendants' counsel omitted]
> THE WITNESS: No, I don't know. I don't know.

(Sweeney Dec. Ex. 3, 51:14-25; 52:9-17). There simply is *no evidence* that all of it is sold under

the name "Gruyere."

Second, the Roth witness disclosed that Roth sells its cheese to "food service" customers,

such as restaurants, cafeterias, and country clubs, which use the cheese in foods they prepare,

without any labelling at all. (The sale to food service customers was not known in the Board

proceeding.) Defendants fail to disclose that the table (D. Mem. 16) is not limited to "private

label" customers, but also includes food service customers, which likely use no labels. (Sweeney

Dec. Ex. 3, 50:16-24). Further, Defendants fail to disclose that the Roth witness did not know

how much cheese was sold to private label customers as opposed to food service customers.

Defendants make much of the letter Roth sent to Wegmans after IDG objected to Wegmans'

use of GRUYÈRE on Wisconsin cheese. Defendants falsely claim the letter shows that Roth

"**'fully supports' generic use of 'gruyere.'**" (D. Mem. 5; bold in original; see also D. Mem. 6,

16). The letter does *not* support the generic use of "Gruyere." It explains that Roth chose not to

use GRUYÈRE on domestic cheese because it "wanted to honor our Swiss heritage and the

traditions of Le Gruyere AOP and only refer to the cheeses crafted in the Gruyere region of

Switzerland and following the very stringent guidelines set out by [IDG] as 'Gruyere.'"

(Sweeney Dec. Ex. 12 (Dep. Ex. 31)). Since Roth does not own the GRUYÈRE mark, it could

not assert rights in that mark against its customers, and it would not make good business sense to

get into a trademark dispute with its own customer. So, it diplomatically said it supports the

customer's right to determine the labelling of its cheese. IDG has objected to Wegmans' use of GRUYÈRE on Wisconsin cheese, and Wegmans is waiting for the outcome of this litigation. [3]

Defendants have no evidence as to the market share of so-called private label "Gruyere" in the larger market for cheese, and no evidence as to the impact, if any, the private label cheese has had on consumer's understanding of the term GRUYÈRE. To prevail on a motion for summary judgment, Defendants must do more than show that some private label cheese is sold in supermarkets as "Gruyere." They must show that private label cheese has had so great an impact that there can be no genuine dispute that GRUYÈRE is understood by a majority of the public as a generic term. Defendants have failed to sustain this burden.

### 3. *Defendants' exaggerate the availability of non-Swiss GRUYÈRE*

Defendants claim, without naming them, that there are "many smaller U.S.-based producers . . . selling gruyere to U.S. consumers." (D. Mem 17). They cite no evidence, only a page in the TTAB opinion. Defendants claim that "Gruyere is also being imported from countries other than Switzerland and France at rates in the millions of pounds" (D. Mem. 17), citing a spreadsheet (D. Mem. 3) that references "processed" cheese. [4] The spreadsheet is hearsay; no witness testified as to its contents and therefore it is not admissible under any exception to the hearsay rule. FRE 803. Further, the document provides no information as to the purpose for which the processed cheese was imported and used. It may have been used as an ingredient in other foods. There is no evidence that it was sold to the general public, or labelled as GRUYÈRE.

Defendants point to Boar's Head's "Gruyere" as an example of how consumers see "gruyere produced in Wisconsin" (D. Mem. 18). But Boar's Head tries to hide the cheese's Wisconsin

---

[3] Under an agreement between the Plaintiffs, enforcement of the mark is the responsibility of IDG.

[4] Processed cheese is a dairy product that includes emulsifiers and other additives and may be made from a blend of cheeses. 21 C.F.R. § 133.

origin, giving it a French name, "Blanc Grue," describing it as "Traditional Old World Alpine," suggesting it is made in Europe, not Wisconsin.[5]  Another example is Deitz & Watson, whose "ORIGINALS" label touts "Traditional Family Recipes," but does not mention the cheese is made in Wisconsin. Finally, labels of Imperfect Foods, which also sells cheese made by Roth, do not say the product is made Wisconsin. (Sweeney Dec. Ex. 3, 52:20-53:1). As for the other labels at D. Mem. 19, Defendants provide no evidence as to the sales levels or market share of these products and the impact, if any, they may have on consumers' perception of GRUYÈRE.

**4.    *The "GRUYÈRE" category in U.S. and international cheese contests does not include non-Swiss, non-French cheese.***

Defendants include a photograph of an old Roth "Gruyere" label, which lists awards it won. (D. Mem. 21). But Roth has not used "Gruyere" on its labels since 2013. Any awards it was won since then have been won under the name "Grand Cru." Similarly outdated is Defendants' claims about the Wisconsin Cheese Makers Association, which runs the World Championship Cheese Contest. See discussion of U.S. cheese contests above. Finally, in the World Cheese Awards contest, all GRUYÈRE cheeses are made in Switzerland.[6]

**5.    *Numerous dictionaries and other authorities show that GRUYÈRE is not generic; Defendants' dictionary evidence is at best ambiguous***

Defendants rely on four dictionaries which, they claim, show that GRUYÈRE is a generic term (D. Mem 22-23). But Plaintiffs also submitted dictionary definitions. *The Encyclopedia Britannica* gives the following definition: "Gruyère, hard cow's-milk cheese produced in the

---

[5] Defendants claim Boar's Head sold "906,130 pounds in 2020," but they fail to disclose that much of the Boar's Head product is cheese sliced behind the deli counter may have no label when sold to the customer. Hoyt Dec. Ex. A ("self-serve" vs. "service" products).

[6] Defendants suggest that that a GRUYÈRE cheese that won a bronze and silver award in the World Cheese Awards contest is not a genuine Swiss GRUYÈRE because it was "produced" by "Castelli UK." (D. Mem. 22-23). But Castelli is the UK food importer that submitted that the cheese to the contest, and is not the producer. The cheese is made in Switzerland.

vicinity of La Gruyère in southern Switzerland and in the Alpine Comté and Savoie regions of eastern France." (Ex. 21). The Merriam-Webster online dictionary defines Gruyère as "a firm cheese with small holes and nutty flavor that is of Swiss origin." (Ex. 22). The Free Dictionary defines "Gruyère cheese" as "A kind of cheese made at Gruyère, Switzerland" (Ex. 23) and Wikipedia defines "Gruyère (cheese)" as "a hard yellow cheese, named after the town of Gruyères in Switzerland, and originated in the cantons of Fribourg, Vaud, Neuchatel, Jura and Berne." (Ex.24) .

Further, the *Oxford Companion to Cheese* states that GRUYÈRE is an *Appellation of Origine Controlée*, for "a cheese from Switzerland" (Ex. 25), the best of which "are widely considered among the greatest of all cheeses." The *Oxford Companion to Cheese* does not describe GRUYÈRE as a generic term. In contrast, it names other cheese names are generic terms. See for example, page 131: "'Cheddar' has become a generic term encompassing a vast range of hard cheeses. . . Cheddar is all things to all people." See also, page 690: "Swiss cheese is the American-born generic term for a category of cheeses, manufactured and sold primarily in the United States . . ." (*Id.*)

Even the Defendants' definitions support Plaintiffs. The Random House definition says it is "a firm yellow cow's milk cheese, esp. of France and Switzerland," and the full definition at oxforddictionaries.com says "Named after Gruyère, a district in Switzerland, where it was first made." (Ex. 26); *Luxco*, 121 U.S.P.Q.2d at 1486-87 ("Despite the fact that these references do not expressly state that Tequila is distilled exclusively in Mexico, they tend to show that consumers would perceive that Tequila is a Mexican alcoholic beverage"). Here, none of the dictionaries mention any other geographic source for Gruyère, and none say Gruyère is merely a type of cheese that can be made anywhere. Finally, they all capitalize Gruyère. *Tea Bd. of India*,

80 U.S.P.Q.2d at 1896 ("We also note that, while not determinative, Darjeeling is always capitalized in these references.") Therefore, dictionary definitions "cannot be conclusive of genericness." *Nat'l Fed'n of the Blind*, 936 F. Supp. at 1248, quoting 2 *McCarthy* § 12:13.

Further, when seen in the light most favorable to Plaintiffs, the dictionary evidence shows there is an issue of fact. In other words, where the evidence is "mixed," the Defendants have failed to show genericness by "a preponderance of the evidence" *Luxco*, 121 U.S.P.Q.2d at 1496, let alone by "clear and convincing evidence." In *Tea Board of India*, the applicant, in support of its counterclaim, submitted dictionary definitions purporting to show Darjeeling was generic. The Board held that some of those dictionary entries were ambiguous, while "a number of the dictionaries reference Darjeeling as the exclusive geographic source of tea from that region." Reviewing all the dictionary entries, the Board concluded that they "fail to show that Darjeeling has a generic meaning." 80 U.S.P.Q.2d at 1895. Similarly, in *In re Dakota Cub Aircraft, Inc.*, Ser. No. 78705733, 2009 WL 1017276, at *4 (T.T.A.B. Mar. 25, 2009), where the evidence, including a dictionary definition, was "ambiguous on the question of whether CUB is used [for airplanes] as a trademark or as a descriptive or generic term," the Board held that CUB "serves a source-identifying function and is not a generic term."[7]

### 6. *Internet evidence does not "demonstrate that gruyere can be produced anywhere."*

Defendants refer to "substantial internet evidence" such as recipes and restaurant menu items. First, much of this evidence is out of date, such as references to Roth's Wisconsin "Gruyere," which was changed to "Grand Cru" in 2013. D. Mem. at 22, discussing internet stories "from May 2010 to February 2011." Defendants fail to explain how this material shows

---

[7] Defendants claim there are, in addition to the four dictionary definitions, "more than 60 reference uses in [Defendants'] favor." (D. Mem. 22). They do not, however, cite or quote from them.

the public's *current* understanding of GRUYÈRE. Moreover, an ad for Austrian "Gruyere" is

meaningless, since there no evidence showing how much Austrian cheese is labelled GRUYÈRE

when sold to U.S. consumers, its market share, or its effect on U.S. consumers.

Similarly, references to "Gruyere" in online recipes do not show genericness. *See Luxco*,

121 U.S.P.Q.2d at 1490 ("Although none indicate the geographic origin of Tequila, there is no

evidence that recipes typically recite the geographic origin of the ingredients comprising the

recipe. Thus, the recipes do not show that consumers are unaware of the geographic origin of

Tequila"). The same is true of restaurant menu descriptions. Restaurants do not always indicate

the origin of ingredients; a menu reference to "Gruyere" could mean Swiss GRUYÈRE.

Finally, weighing against genericness is the fact that the USPTO has twice said that

GRUYÈRE is not generic: in Registration No. 4,398,359 and the Application at bar.

**7.  *Defendants' calculations of the amount of non-Swiss and non-French cheese is misleading.***

Defendants claim that "a majority of the gruyere in the U.S. is non-Swiss and non-French."

(D. Mem. 24). This is misleading since it includes processed cheese, and Defendants are unable

to explain how this processed cheese is used, whether it is labelled with the Gruyere name, and

whether it is sold to consumers. Moreover, as noted above, Defendants have no idea how much

Grand Cru cheese is re-labelled "Gruyere" when sold to consumers, if it is labelled at all. Nor do

Defendants know what impact, if any, this has had on consumers.

### III.   STATEMENT OF FACTS IN DISPUTE

These facts are in dispute: Whether GRUYÈRE is generic. What is the "primary

significance" of GRUYÈRE to a majority of consumers? How much Wisconsin cheese is

labelled "Gruyere" when sold to consumers? What is the market share of this cheese in the much

larger cheese market? What is the impact of this alleged sale on consumer perception of the

mark? Do consumers even notice that store brand "Gruyere" cheese may be made in Wisconsin, not Switzerland or France? Is there any reason to call a bland, characterless cheese made in Wisconsin "Gruyere"? Is that not misleading, as it falsely suggests that the Wisconsin cheese has the same taste, aroma, and other characteristics as Swiss and French GRUYÈRE?

## IV.   STATEMENT OF CONTROVERTED FACTS

Paragraph numbers below refer to paragraphs in Defendants' list.

1. Admitted.

2. There is no admissible evidence that "cheesemakers left the region," that any cheese produced in Austria, Germany, or the U.S. was made by cheesemaker from the Gruyere region, or that any cheese made in Austria, Germany or the U.S. is in fact GRUYÈRE.

3. The document on which Defendants rely is hearsay; no witness testified as to its contents and therefore it is not admissible under any exception to the hearsay rule. FRE 803. Further, the document provides no information as to how the cheese is labelled (if labelled at all) when used or sold in the U.S.

4. There is no admissible evidence that "Cheesemakers in the U.S. have been producing gruyere since at least the late 1980s." The Roth witness did not begin working at Roth until 2015. Further, it takes more than "Swiss-style manufacturing equipment" to make GRUYÈRE cheese. GRUYÈRE is painstakingly made in the mountains of the GRUYÈRE region from local, natural ingredients using traditional methods that assure the connection between the geographic region and the quality and characteristics of the final product. This cannot be duplicated in Wisconsin.

5. Roth does not and has not produced GRUYÈRE. Although prior to 2013 Roth sold cheese under the name "Gruyere," it stopped using that name in 2013. No witness from Roth (or any other witness) offered any explanation as to why its cheese should be called "Gruyere."

6.  Plaintiffs admit that Roth Kase was purchased by Emmi AG, a Swiss company, and became Emmi Roth USA, Inc., trading as Roth Cheese. There is no evidence that Roth sold "massive quantities" of "gruyere" after 2013. Roth stopped using the name Gruyère in 2013. Thus, the total quantity Roth sold under the name "Gruyere" since 2013 is **zero**.

7.  The document refers to "processed" cheese. The document is hearsay; no witness testified as to its contents and therefore it is not admissible under any exception to the hearsay rule. FRE 803. Further, the document provides no information as to the purpose for which the processed cheese was used. It may have been used as an ingredient in other foods. There is no evidence that the processed cheese was sold to the general public or labeled as GRUYÈRE.

8.  There is no admissible evidence to support these conclusory allegations.

9.  There is no admissible evidence to support these conclusory allegations, which appear to be based on a false assumption. Defendants appear to have unilaterally decided that certain cheese sold by Roth for "private label" use is Gruyere, even though Roth calls the cheese Grand Cru. Roth sells its Grand Cru cheese to supermarkets and distributors that package the cheese under the supermarket's or distributor's own "private label." The Roth witness had no idea how much cheese is sold by supermarkets as Gruyere. Roth also sells its cheese to "food service" customers, such as restaurants and cafeterias that use the cheese in foods they prepare, without any labelling at all.

10. Admitted.

11. Admitted that GRUYÈRE is not protected in the U.S. as a PDO or PGI. However, it is protected as both a registered certification mark and as a common law certification mark.

12. Admitted.

13. Admitted.

14. The mark in Registration 4,398,395 is not "a design." It includes the term GRUYÈRE, and the USPTO *did not* require IDG to disclaim GRUYÈRE. Thus, it *did not* find GRUYÈRE generic.

15. First, Roth has not sold GRUYÈRE under its own house brand, Roth Cheese, since 2013. Second, Roth does not sell "Gruyere" to retailers. It sells Grand Cru cheese to retailers; some retailers choose to call it "Gruyere." The Roth witness explained this repeatedly at his deposition. Roth's lawyer had to correct Defendants' lawyer at the deposition when defense counsel insisted on saying that "Roth makes Gruyere" for private label customers. (Sweeney Dec. Ex. 3, 43:6-17). Third, Roth sells this cheese to food service, where it is used with no labelling.

16. For the same reasons, Defendants' claim that "Roth annually sells millions of pounds of domestically produced gruyere in the U.S." is false.

17. In 2013, Roth stopped using "Gruyere" on cheese it sold under its own Roth brand. Defendants call this a "deal" as if there is something suspicious or improper about it. In fact, Roth simply recognized that GRUYÈRE is a certification mark that should be used only on cheese made in the GRUYÈRE region under Plaintiffs' exacting standards. Defendants' statement that "there would be no change to Roth's practices with respect to private label gruyere" is false. Roth agreed to educate its customers that they should not use GRUYÈRE on cheese made in Wisconsin. Enforcement of the GRUYÈRE certification mark was left to IDG.

18. Roth does not "domestically produces gruyere which is sold to U.S. consumers," In fact, Roth calls the cheese "Grand Cru" and its customers use various names for it (or no name at all). There is no evidence as to how much is labelled "Gruyere" when sold to consumers.

19. For the same reasons, this is misleading.

20. Roth does not support the use of "Gruyere" on the supermarket's cheese.

21. Plaintiffs' admit that the Swiss Plaintiff sent letters – as would any trademark owner – to entities that were misusing its mark. There is nothing misleading about the IDG letters. As noted above, Registration No. 4,398,395 includes the term GRUYÈRE and the Swiss Plaintiff can lawfully claim rights in that term, including common law rights in the mark. Further, there is no basis for calling Roth's agreement to stop using GRUYÈRE "illusory." Roth *did* stop using the mark GRUYÈRE in 2013, and has not used it since then.

22. Although some retailers did not agree to stop using GRUYÈRE on cheese not made in Switzerland, many retailers did agree to stop using it, including a number of large, significant retailers as well as the WMMB and Ammerlander Dairy in Germany.

23. Plaintiffs admits that they filed a new application in 2015, but deny that their prior efforts "failed." In fact, the USPTO had issued Reg. No. 4,398,395 in 2013, hardly a "failed effort."

24. Admitted.

25. Defendants fail to mention that, in response to Plaintiffs' 2015 application, the USPTO approved registration of GRUYÈRE per se, without any design elements, thus concluding that GRUYÈRE is not a generic term.

26. The TTAB ruled in Defendants' favor, but made numerous factual and legal errors.

27. Plaintiffs admit that the TTAB purported to consider several categories of evidence but it made numerous factual and legal errors.

28. This paragraph is argumentation (such as discovery "enhances the underlying TTAB record and supports the decision") rather than material facts not in dispute. To the extent it state facts, Plaintiffs respond: (a) The standards of identity are irrelevant. Defendants admit that no cheese maker or seller is required to use "gruyere"; (b) No evidence supports the claim that "most U.S. gruyere comes from places other than Switzerland and France"; (c) Roth does not sell cheese

under the name "Gruyere"; (d) Many entities are awaiting the outcome of this litigation; (e) Much of the internet evidence is outdated; (f) There is no evidence that the public is aware of the Tariff Schedule; (g) The Glanbia declarant does not say where the cheese is sold, or whether it is labelled "Gruyere" when it reaches consumers.

## V. CONCLUSION

Defendants have not explained how this Court can say there is no genuine issue as to the "primary significance" of GRUYÈRE in the minds of a majority of consumers, given that Defendants have presented no evidence of consumer understanding – in the form of consumer testimony or a consumer survey. Moreover, Defendants rely on false and exaggerated claims about the amount of domestic cheese sold in the U.S. under the name "Gruyere"; the dictionary definitions are at best evenly weighted; Defendants have offered no information on the market share of "private label" cheese in the context of the much larger cheese market; and they have offered no evidence as to the impact of this alleged sale on consumers. Moreover, Defendants cannot show that there is no genuine issue as to whether GRUYÈRE has "lost all significance as a mark." For all these reasons, Defendants' meritless motion should be denied.

Dated: April 12, 2021                    Respectfully submitted,

                                               By: /s/ Carl E Jennison

                                               Carl E. Jennison (VSB # 42889)
                                               John N. Jennison (VSB #21842)
                                               JENNISON & SHULTZ, P.C.
                                               3918 Prosperity Avenue, Suite 215
                                             Fairfax, Virginia 22031-3330
                                             (703) 415-1640
                                             (703) 415-0788 (fax)
                                             Carl@JennisonLaw.com
                                             John@JennisonLaw.com

                                               Richard Lehv (pro hac vice)
                                             Daniel Nuzzaci (pro hac vice)

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
151 West 42nd Street, 17th Floor
New York, New York 10036
(212) 813-5900
rlehv@fzlz.com
dnuzzaci@fzlz.com

*Attorneys for Plaintiff/*
*Counterclaim Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing document via CM/ECF.

Date: April 12, 2021                    By: /s/ Carl E Jennison

                                             Carl E. Jennison