# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

INTERPROFESSION DU GRUYÈRE, *et al.*,  )
       **Plaintiffs,**  )
         )
       **v.**  )     **Civil Action No. 1:20-cv-1174**
         )
U.S. DAIRY EXPORT COUNCIL, *et al.*,  )
       **Defendants.**  )

## <u>MEMORANDUM OPINION</u>

This is a dispute between European and American cheesemakers over whether the term **GRUYERE** should receive geographic trademark protection such that the term may only be used to identify and describe cheeses produced in certain portions of Switzerland and France, or whether the term **GRUYERE** is understood by cheese purchasers in the United States to be generic in that it refers to a type of cheese without regard to where that cheese is produced. Plaintiffs filed an application with the United States Patent and Trademark Office ("USPTO") to register the term **GRUYERE** as a certification mark pursuant to 15 U.S.C. § 1127. Defendants filed an opposition to that certification mark application with the Trademark Trials and Appeals Board ("TTAB"), arguing that the term **GRUYERE** is generic. The matter was heard by the TTAB, which issued a written opinion holding that the term **GRUYERE** is generic for a type of cheese without regard to the cheese's geographic origins and sustained the opposition to the certification mark. Thereafter, plaintiffs filed this civil action contesting the TTAB's decision pursuant to 15 U.S.C. § 1071(b).

In accordance with § 1071(b) the parties have engaged in additional discovery and supplemented the factual record. At issue now is defendants' motion for summary judgment, *see* Dkt. 62, which has been fully briefed and argued orally, and is therefore now ripe for disposition.

## I.

The central question presented by this case is whether cheese purchasers in the United States understand the term **GRUYERE** to refer only to a specific type of cheese produced in the Gruyère region of Switzerland and France or whether cheese purchasers in the United States instead understand **GRUYERE** as a generic term which refers to a type of cheese regardless of where the cheese is produced.

Plaintiffs in this case are two European consortiums, the Swiss Interprofession du Gruyère and the French Syndicat Interprofessional du Gruyère (hereinafter referred to collectively as "plaintiffs"). In 2015, plaintiffs filed an application for a certification mark with USPTO for the term **GRUYERE**. The certification mark would "certif[y] that the cheese originates in the Gruyère region of Switzerland and France." Application Serial No. 86759759, filed September 17, 2015. Defendants in this case, the United States Dairy Export Council, the Atalanta Corporation, and Intercibus Inc. (hereinafter referred to collectively as "defendants"), filed an opposition to plaintiffs' application for the certification mark, arguing that cheese purchasers in the United States understand **GRUYERE** to be a generic term referring to a type of cheese that can be produced anywhere. The parties developed an extensive record, consisting of affidavits, sales data, and reference materials, and argued the issue fully before the TTAB. At the end of that proceeding, the TTAB issued a detailed opinion, concluding that United States purchasers and consumers of cheese understand the term **GRUYERE** to refer to a type of cheese that can be produced anywhere. Accordingly, the TTAB sustained the opposition to the Consortium's application for a certification mark on the ground that the term **GRUYERE** had become generic.[1]

---

[1] Defendants also challenged the proposed certification mark—both before TTAB and in the present case—on the ground that plaintiffs failed to exercise legitimate control over the certification mark and that the mark should therefore be invalidated. The TTAB opinion did not

**II.**

The procedural and substantive legal principles that govern this case are undisputed and well-settled. Thus, the procedural principles are as follows. Summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "bears the initial burden" of showing that no genuine dispute of material fact exists. *Atkins v. Glaser T*, 823 F. App'x 218, 219 (4th Cir. 2020). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party opposing summary judgment must provide more than mere denials and allegations to create a dispute of material fact and must instead "set forth specific facts showing that there is a genuine issue for trial." *Id.* Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

The substantive legal principles governing this case are also essentially undisputed. This matter involves an application for a certification mark, which is defined under the Trademark Act as "any word, name, symbol, or device" used "to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics" of goods. 15 U.S.C. § 1127. As the TTAB has explained, "[g]eographic certification marks are used to certify that authorized users' goods or services originate in a specific geographic region." *In Re St. Julian Wine Co., Inc.*, No.

---

reach the lack of control argument because it sustained defendants' challenge on genericness. It is similarly unnecessary to address the lack of control arguments here, as defendants once again prevail on genericness. Further, genericness, and not lack of control, was the primary thrust of the briefing on this motion for summary judgment.

87834973, 2020 WL 2788005, at *3 (TTAB, May 27, 2020). For example, certification marks have been approved for the term Roquefort (applied to cheese from a specific municipality in France, *see Cmty. of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494 (2d Cir. 1962)), for the name Cognac (applied to brandy distilled in a certain region of France, *see Bureau Nat'l Interprofessionnel Du Cognac v. Int'l Better Drinks Corp.*, 6 USPQ2d 1610 (TTAB 1988)), and the phrase Sunshine Tree (applied to citrus fruits originating in the state of Florida, *see State of Fla., Dep't of Citrus v. Real Juices, Inc.*, 330 F. Supp. 428 (M.D. Fla. 1971)). Section 4 of the Lanham Act provides that "certification marks, including indications of regional origin, shall be registrable under this chapter, in the same manner and with the same effect as are trademarks." 15 U.S.C. § 1054. Accordingly, the decision to grant or reject a certification mark application involves consideration of similar factors as the decision to grant or reject a trademark application.

This case arises under 15 U.S.C. § 1071(b), which "permits a party in a trademark suit to initiate a civil action [in district court] in the place of an appeal of the TTAB's determination to the Federal Circuit." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014). In a § 1071(b) proceeding, the parties may introduce the record the TTAB relied on and may supplement that record with additional evidence. When new evidence is offered in a § 1071(b) proceeding, district courts "must make *de novo* factual findings that take account of both the new evidence and the administrative record." *Kappos v. Hyatt*, 566 U.S. 431, 446 (2012). The Fourth Circuit has made clear that district courts must review both the administrative record and any new evidence *de novo*, in comparison to the more deferential substantial evidence standard applied when a party appeals a TTAB decision to the Federal Circuit. *See Shammas v. Focarino*, 784 F.3d 219, 225 (4th Cir. 2015). Thus, the determination of genericness in this case is made *de novo*, and the TTAB's opinion is not given deference. The Fourth Circuit has further clarified that in

§ 1071(b) proceedings the district court, and not a jury, "acts as the trier of fact." *Id.*; *see also Belmora LLC v. Bayer Consumer Care AG,* 987 F.3d 284, 298 (4th Cir. 2021), *cert. denied*, No. 21-195, 2021 WL 5284616 (U.S. Nov. 15, 2021).

**III.**

Given that summary judgment is appropriate only where there are no genuine disputes of material fact, *see* Fed. R. Civ. P. 56, this analysis properly begins by identifying the record facts as to which no genuine dispute exists. Local Rule 56(B) directs a movant for summary judgment to include in its submission a section listing all material facts as to which the movant contends no genuine dispute exists. The nonmovant must then respond to each numbered paragraph, either admitting or contesting the putative undisputed fact and citing admissible record evidence to establish a genuine dispute of material fact. The nonmovant's failure to respond to a fact listed by the movant constitutes an admission that the fact is undisputed. Local Rule 56(B). Accordingly, the facts recited here are derived from defendants' list of material facts and plaintiffs' responses.

- **GRUYERE** cheese production dates to at least 1115 AD, and **GRUYERE** cheese originated in western Switzerland in the Gruyère region in the Canton of Fribourg. In time, **GRUYERE** production expanded to east-central France along the border between Switzerland and France. Swiss and French **GRUYERE** producers make cheese from the unpasteurized milk of cows that graze on alpine grasses. The resulting cheese goes through a rigorous aging and production process.

- **GRUYERE** cheese has been granted protected status in Europe. Specifically, in 2011, the European Union recognized Swiss **GRUYERE** with a protected designation of origin ("PDO"). In 2012, France's National Institute of Origin and Quality approved a protected geographical origin ("PGI") for French **GRUYERE**. These PDO and PGI indications

require that **GRUYERE** cheese cannot be sold in the European Union unless it is produced in the Gruyère region spanning an area across Switzerland and France and meets other quality standards.[2]

- In 2010, the Swiss Consortium applied to the USPTO to register the words "LE GRUYERE" as a certification mark for cheese produced in Switzerland (but not cheese produced in France). The USPTO rejected the mark, finding that "'**GRUYERE**' is a type or class of firm cheese made of cow's milk with a rich and nutty flavor" and that **GRUYERE** was a generic term for this type of cheese. Dkt. 69-1 at 7–10.

- In 2013, the Swiss Consortium sought and received from the USPTO a certification mark for a design with stylized font, the letters "AOC", a Swiss cross, and the words "LE GRUYÈRE SWITZERLAND." This design can be applied to cheese sold in the United States only if the cheese originates in the Gruyère region of Switzerland (but not France). The certification mark is pictured below.



---

[2] The parties do not dispute that the PDO and PGI designations do not control the use of the term **GRUYERE** in the United States. Any restriction on the use of the term **GRUYERE** in the United States must be governed by the trademark law of this country.

- The design certification mark for "LE GRUYERE SWITZERLAND AOC," is distinct from the certification mark at issue in this case. The design certification mark that the Swiss plaintiff has already obtained simply means that when a cheese bears the design certification mark (stating "LE GRUYERE SWITZERLAND AOC" and featuring the graphic of the Swiss cross) that cheese must come from Switzerland. The certification mark sought by plaintiffs in this case is much broader and would require that *any* time the term **GRUYERE** is used on cheese that the cheese must have been produced in the Gruyère region of Switzerland and France. There is no dispute that the outcome of the present case does not affect the validity of the design mark that the Swiss plaintiff has already obtained.

- Data from the United States Department of Agriculture ("USDA") shows that, as of 1995 (the earliest year for which data is available) cheese labeled **GRUYERE** was imported into the United States from Switzerland, France, the Netherlands, Germany, Austria, Belgium, and Denmark. USDA data also shows that from 2010–2020, cheese labeled **GRUYERE** was imported into the United States from Switzerland, France, the Netherlands, Germany, Egypt, Denmark, Austria, Belgium, Ireland, the Czech Republic, Italy, and Tunisia.

- Cheese produced in the United States has been sold as **GRUYERE** since at least 1987. At that time, Roth Käse, an American cheesemaker, imported Swiss-style manufacturing equipment and began producing cheese in Wisconsin which was labeled and sold as **GRUYERE** in the United States.

- In 2010, Roth Käse was purchased by Emmi AG, a Swiss company and a member of the Swiss Consortium that is one of the plaintiffs in this case. Roth Käse and Emmi AG merged their U.S. operations, which became Emmi Roth USA, Inc. ("Emmi Roth").

- Currently, Emmi Roth produces sells some of its cheese through its own house brand,

"Roth," and sells the remainder of its cheese through private label sales to numerous retailers that sell Roth cheese under their own brands and labels. In 2013, Emmi Roth and the Swiss Consortium reached an agreement that Roth would stop using the term **GRUYERE** on its house brand and would instead call the cheese "Grand Cru." Notably, this change did not apply to Roth's private label customers, which remain free to use the term **GRUYERE** when they resell Roth's cheese products to customers in the United States. As part of the agreement between Emmi Roth and plaintiffs, Roth agreed to educate its customers that they should not use **GRUYERE** to describe cheese made in Wisconsin, but the customers remain free to use the term **GRUYERE** as a label for their cheese if they choose to do so.

- In September 2014, Roth sent a letter to the grocery store chain Wegmans, one of Roth's private label customers, acknowledging that Wegmans sells Roth's Wisconsin-made cheese as **GRUYERE** in Wegmans grocery stores. *See* Dkt. 72-4 at 54. In this letter, an executive for Roth write that "[w]e know of course that Wegman's sells our Wisconsin-made Grand Cru® cheese under Wegmans private label as 'Mild Gruyere.'" *Id.* Significantly, the Roth executive did not object to Wegmans labeling its American-produced cheese as **GRUYERE**, but instead explained that Roth "fully support[s] our customers' rights to determine the labeling of their private label products." *Id.*

- From 2014–2020, Emmi Roth sold more than ▮▮▮▮▮▮▮▮▮▮ of cheese for consumption in the U.S. market, including ▮▮▮▮▮▮▮ of cheese in 2020 alone. Some of this cheese was sold under Roth's own label and marked as "Grand Cru," some was sold by private label customers as **GRUYERE**, and some was sold by private label customers under other labels. All of this cheese was made in Wisconsin.

- There is no record that plaintiffs attempted to police the use of the term **GRUYERE** in the United States prior to 2012. Plaintiffs did undertake efforts to protect the term **GRUYERE** from 2012 to 2017. These efforts included sending letters asking retailers and manufacturers to cease using the term **GRUYERE** to label cheeses which were not produced in the Gruyère region of Switzerland and France. These attempts to control the use of the term **GRUYERE** achieved only limited success. Some cheese sellers, including Ammerland Dairy in Germany and the Wisconsin Milk Marketing Board, agreed to comply and stopped using the term **GRUYERE** to refer to cheeses not made in the Gruyère region of Switzerland and France. But many producers and retailers continued to use the term **GRUYERE** to label cheeses created outside the Gruyère region of Switzerland and France, including Boars' Head, Dairyfood USA, Dietz & Watson, Finlandia, Intersouce, Red Apple, Trader Joe's, Wegmans, and Wood River Creamery.

- In 2015, plaintiffs filed the application with the USPTO at issue in this case, seeking to register the standard character term "Gruyere" (without the design previously registered in 2013 limited to Switzerland) as applied to cheese products. That application is the subject of this case. The application for the certification mark explains that "[t]he certification mark, as used by persons authorized by the certifier, certifies that the cheese originates in the Gruyère region of Switzerland and France." Application Serial No. 86759759, filed September 17, 2015.[3]

---

[3] The application for the certification mark further explains that the Gruyère region includes

> 1) In Switzerland this region includes the cantons of Fribourg, Vaud, Neuchatel, Jura, and the districts of Courtelary, La Neuveville, Moutier as well as the communes of Ferenbalm, Guggisberg, Mühleberg, Münchenwiler, Rüschegg and Wahlern of the canton of Bern. 2). In France this region includes the departments of Doubs, Jura, Haute-Saône, Savoie and Haute-Savoie as well as the cantons of

- The USPTO approved the 2015 application, and defendants subsequently filed an opposition. In proceedings before the TTAB, defendants argued that the certification mark was invalid for two reasons: (1) the term **GRUYERE** is generic and therefore unregistrable and (2) that plaintiffs failed to exercise legitimate control over the mark. The TTAB ruled in defendants' favor on the ground of genericness and did not reach the control issue.

- The TTAB opinion considered a variety of evidence, including reference materials, U.S. food labeling standards, commercial sales data, industry practice, and internet evidence.

- After plaintiffs initiated this review of the TTAB decision, the parties engaged in additional discovery and further supplemented the record. This additional evidence includes deposition testimony from cheese industry experts, reference materials information from U.S. customs data about imports of cheese labeled **GRUYERE**, and sales information about Glanbia, a new cheesemaker in the United States that sells cheese labeled as **GRUYERE**.

---

Amberieu-en-Bugey, Bellegarde-sur-Valserine, Belley, Brénod, Ceyzériat, Champagne-en-Valromey, Coligny, Collonges, Ferney-Voltaire, Gex, Hauteville-Lompnes, Izernore, Lagnieu, Lhuis, Nantua, Oyonnax-Nord, Poncin, Pont- d'Ain, Saint-Rambert-en-Bugey, Seyssel, Treffort- Cuisiat, Virieu-le-Grand, Péronnas, Oyonnax-Sud, Viriat, Oyonnax, Bourg-en-Bresse in the department of Ain, the cantons of Fontaine-Française, Saint-Jean- de-Losne, Seurre in the department of Côte-d'Or, the cantons of Saint-Laurent-du-Pont and Touvet in the department of Isère, the cantons of Bourbonne-les- Bains, Bourmont, Clefmont, Fayl-la-Forêt, Laferté- sur-Amance, Langres, Longeau-Percey, Val-de- Meuse, Neuilly-l'Evêque, Nogent, Prauthoy, Terre- Natale in the department of Haute-Marne, the cantons of Beaurepaire-en-Bresse, Cuiseaux, Pierre-de-Bresse, Saint-Germain-du-bois in the department of Saône-et- Loire, the cantons of Bains-les-Bains, Darney, Lamarche, Monthureux-sur- Saône, Plombières-les- Bains, Xertigny in the department of Vosges, the cantons of Delle, Fontaine, Giromagny, Rougemont-le-Château, Valdoie, Châtenois -les-Forges, Danjoutin, Beaucort, Grandvillars, Offemont, Belfor in the department of Territoire de Belfort.
Application Serial No. 86759759, filed September 17, 2015. This Order refers to this area as the "Gruyère region of Switzerland and France" for ease of reference.

## IV.

It is undisputed that "[w]hether an asserted mark is generic or descriptive," which is the central issue in this motion, "is a question of fact." *Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1364 (Fed. Cir. 2018). Although questions of fact are not often appropriate for resolution on a motion for summary judgment, the Fourth Circuit has held that a challenge to a term's genericness can be properly resolved on summary judgment where "the evidence of genericness was so one-sided that no genuine issue of fact existed." *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 546 (4th Cir. 2004); *accord Institut National Des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574 (Fed. Cir. 1992) (affirming a grant of summary judgment where the record showed "no genuine dispute as to whether Chablis is used in the United States as the generic name for a type of wine with the general characteristics of French Chablis.") (internal quotations omitted). The Federal Circuit has also noted that genericness may be resolved on summary judgment where "uncontested evidence of genericness" if the non-moving party offers only weak, "indirect evidence [that] cannot raise a genuine issue of material fact even when considered in a light most favorable to" the non-moving party. *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1571 (Fed. Cir. 1995).

Summary judgment in this case may also be appropriately considered because, as previously discussed, "a district court in a § 1071(b) action reviews the record *de novo* and acts as the finder of fact." *Belmora LLC,* 987 F.3d at 298. Therefore, if summary judgment on this motion is denied, the case will proceed to a bench trial and not a jury trial. It is true that a different standard of review applies at a motion for summary judgment than would apply at a bench trial, as a motion for summary judgment requires that a district court "view the evidence in the light most favorable to . . . the non-movant," *Dennis*, 290 F.3d at 639, while at a bench trial, a

district judge is required to assess the credibility of witnesses and "has the duty to weigh evidence and draw reasonable inferences and deductions from that evidence." *Invs. Title Ins. Co. v. Bair*, 296 F. App'x 332, 333 (4th Cir. 2008). But given the Fourth Circuit's command that district court judges act as finders of fact in § 1071(b) actions, the Court would be required to find further facts as needed from the complete factual record compiled by the parties in this proceeding were the case to go to trial. In that respect, therefore, the Court would find the following facts from the factual record:

- Roth Käse was founded in the United States in 1987 with the purpose of producing **GRUYERE** cheese in the United States and first produced cheese in 1992. Dkt. 73-5 at 6. Roth Käse produced hundreds of thousands of pounds of cheese in the United States in its first year, with its flagship cheese labeled as **GRUYERE** as. *Id.* In 2010, Roth Käse was sold to Emmi AG, a Swiss company, and the two entities merged to form Emmi Roth. At the time of the merger, Roth Käse was producing in the United States and selling approximately ███████████ of cheese labeled as **GRUYERE** every year. *Id.*

- Even after the merger between Roth Käse and Emmi AG, Emmi Roth continued producing cheese in the United States and selling that cheese as **GRUYERE** in the United States, under both its own label and through private label customers that resold that cheese. In 2012 Emmi Roth sold nearly ██████████ of its U.S.-made cheese labeled as **GRUYERE** under its own Roth brand and sold an additional ██████ ██████ of this cheese through its private label customers who could label the cheese any way they wished. The below sales figures show the annual pounds of U.S.-made cheese labeled as **GRUYERE** sold by Emmi Roth from 2012 to 2020. Although the bottom row

of the chart is labeled "Domestic Private Label Branded Gruyere," only some of Emmi Roth's private label customers actually resell the cheese as **GRUYERE**, and they are not required to use that name.

| Sales in Pounds, of | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Domestic Roth branded Gruyere | | | | | | | | | |
| Domestic Private Label Branded Gruyere | | | | | | | | | |

- The term **GRUYERE** has been applied to non-Swiss, non-French-produced cheeses by U.S. cheesemakers and cheese retailers for decades. Not until 2012 did plaintiffs begin efforts to control the use of the term **GRUYERE** in the United States, and those efforts have met only limited success. Indeed, many prominent retailers continue to use the term **GRUYERE** without respect to the geographic origin of the cheese, and defendants have introduced undisputed evidence that hundreds of thousands of pounds cheeses labeled as **GRUYERE** are either produced in the United States or imported from regions other than the Gruyère region of Switzerland and France and sold in the United States every year.

- In 2016, a new company, Glanbia, began producing cheese in Idaho that it sells in the United States labeled as **GRUYERE**. Glanbia sold over ███████████ of **GRUYERE** cheese in 2018 and 2019, and sold over ██████████████ of **GRUYERE** in 2020.

- The record evidence shows that more than ████████████ of **GRUYERE** cheese produced outside the Gruyère region of Switzerland and France were sold in the United States in each year from 2016 to 2020. This includes sales of **GRUYERE** cheese produced in the United States by Emmi Roth and Glanbia.

**IV.**

As noted, the central issue in this matter is whether the term **GRUYERE** has become

generic for a certain type of cheese and is no longer understood to refer only to cheese which comes from the Gruyère region of Switzerland and France. Also as noted, the legal principles that govern genericness are well-settled. It is textbook law that "generic terms can never obtain trademark protection." *Booking.com B.V. v. United States Pat. & Trademark Off.*, 915 F.3d 171, 177 (4th Cir.), as amended (Feb. 27, 2019), *aff'd*, 140 S. Ct. 2298 (2020). As the Supreme Court has explained, "[a] generic name—the name of a class of products or services—is ineligible for federal registration" as either a trademark or as certification mark. *U.S. Pat. and Trademark Off. v. Booking.com B.V.*, 140 S. Ct. 2298, 2301 (2020). Generic terms are ineligible for certification mark protection, or indeed any trademark protection, because they are incapable of telling consumers where the product with a generic name was produced. *Id.* at 2303.

A term which was once non-generic and conveyed the quality or origins of good can become generic over time through a process called genericide, which occurs when a generic term "ceases to identify in the public's mind the particular source of a product or service but rather identifies a class of product or service, regardless of source." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). McCarthy, the leading treatise on trademark law explains that "[t]he concepts of 'generic name' and 'trademark' are mutually exclusive. Thus, if, in fact, a given term is 'generic,' it can never function as a mark to identify and distinguish the products of only one seller" or geographic region of production. 2 THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:1 (5th ed. 2020) (hereinafter "McCarthy").

Under the Lanham Act, the test for genericness is "[t]he primary significance of the registered mark to the relevant public rather than purchaser motivation." 15 U.S.C. § 1064(3); *accord Glover*, 74 F. 3d at 59 ("To become generic, the primary significance of the mark must be its indication of the nature or class of the product or service, rather than an indication of [a

particular geographic] source."). Consistent with this, the Federal Circuit has explained that "the relevant public's perception is the primary consideration in determining whether a term is generic." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 969 (Fed. Cir. 2015) (internal quotations omitted). And in this respect, the party opposing registration—here, defendants— "bears the burden of proving genericness by a preponderance of the evidence." *Royal Crown Co.*, 892 F.3d at 1366.

V.

Given these legal principles, it is appropriate to consider *de novo* the record compiled by the parties in this case and determine whether summary judgment is appropriate. Defendants contend that the factual record in this case points indisputably to the conclusion that cheese purchasers in the United States understand the term **GRUYERE** to refer to a generic type of cheese without reference to the geographic location where the cheese is produced. Plaintiffs disagree, arguing that the evidence is inconclusive and therefore cannot support summary judgment.

Although the term **GRUYERE** may once have been understood to indicate an area of cheese production, the factual record makes it abundantly clear that the term **GRUYERE** has now, over time, become generic to cheese purchasers in the United States.

Controlling authority makes clear that to ascertain the genericness of a term, courts may consider "any competent source," *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 599 (Fed. Cir. 2016). A competent source for determining genericness may include "not only consumer surveys, but also dictionaries, usage by consumers and competitors, and any other source of evidence bearing on how consumers perceive a term's meaning." *Booking.com B. V.*, 140 S. Ct. at 2307 n.6. In evaluating claims that a term has become generic, the Federal Circuit has considered the use of that term on "various packaging and marketing materials" in the relevant industry, *Royal Crown*

*Co.*, 892 F.3d at 1370, as well as the use of the purportedly generic term "in the [relevant] industry and by the media." *Princeton Vanguard, LLC.*, 786 F.3d at 970.

Although courts and scholars have noted the usefulness of survey data in trademark cases, neither plaintiffs nor defendants have introduced a consumer survey in this case. Plaintiffs argue that the absence of survey data should result in an inference that such a survey would show that consumers do not understand the term **GRUYERE** to be generic and that defendants' failure to provide a consumer survey should preclude summary judgement. Not so. The Federal Circuit has made clear that while "consumer surveys may be a preferred method of proving genericness under the proper test of purchaser understanding," genericness may be established without survey data. *BellSouth Corp.*, 60 F.3d at 1570. McCarthy confirms this conclusion, explaining that "[m]ost courts hold either that there is no requirement for a survey or that no adverse inference should be drawn from the failure of a party to conduct a survey." McCarthy § 32:195. Further, the Federal Circuit has cautioned that courts should "not infer from [a party's] failure to provide survey evidence that such evidence would be harmful" to that party's case. *Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed. Cir. 2012). Accordingly, the absence of a consumer survey by either party does not preclude summary judgment. Instead, summary judgment may be granted only if the undisputed material facts make it abundantly clear that the term **GRUYERE** has come to be understood by cheese purchasers in the United States as a generic term.

The record evidence provides overwhelming evidence that cheese purchasers in the United States understand the term **GRUYERE** to be a generic term which refers to a type of cheese without restriction as to where that cheese is produced. The record includes three categories of evidence: (1) existing U.S. regulations permitting the use of the term **GRUYERE**

on cheese regardless of where the cheese is produced; (2) commercial and government data showing the widespread sale and import of **GRUYERE** cheese produced outside the Gruyère region of Switzerland and France; and (3) evidence showing that the term **GRUYERE** is commonly used in dictionaries, media communications, and cheese industry events and materials to refer to a type of cheese without respect to where the cheese is produced.

A. *FDA regulations recognize that a cheese can be labeled* **GRUYERE** *regardless of where the cheese is produced*

Defendants, in their argument, first point to the Food and Drug Administration ("FDA") standard of identity for **GRUYERE**, which permits the use of the term **GRUYERE** on cheese labels with no requirements about where that cheese is produced. The Fourth Circuit has explained that the FDA's standards of identity are "important to the FDA's capacity to regulate those characteristics of a food label that would enable a food to be marketed as such, and to ensure that certain foods accord with consumer expectations." *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 621 (4th Cir. 2015). In 1977, the FDA issued a standard of identity for **GRUYERE** codified at 21 C.F.R. § 133.149. That standard of identity describes **GRUYERE** as a cheese with "a mild flavor, due in part to the growth of surface-curing agents," which "contains small holes or eyes," is aged "at least 90 days," and has a "minimum milkfat content of 45 percent by weight of the solids and the maximum moisture content is 39 percent by weight." 21 C.F.R. § 133.149(a).

Significantly, the FDA's standard of identity for **GRUYERE** does not mention Switzerland, France, or any other regional restrictions on where **GRUYERE** cheese must be produced. Thus, cheese produced outside the Gruyère region of Switzerland and France may be labeled as **GRUYERE** and sold to United States consumers without contravening FDA regulations. Although the FDA issued this standard of identity in 1977, plaintiffs have never sought to challenge or revise the standard of identity for **GRUYERE**, which permits the term to be used

without geographic limitation.

There is no doubt that the FDA's standard of identity for **GRUYERE** is relevant to the genericness inquiry. Indeed, the USPTO's Trademark Examination Guide explains that the cheese names included on the FDA's standards of identity "cannot be single-source indicators, and inclusion on such lists is strong evidence that the otherwise geo-significant wording is generic for the goods." USPTO Exam Guide 2-20 (May 2020) at 12-13. The USPTO guide explains that "standards of identity relate solely to production methods and ingredients, there is no requirement that the product come from a specific place, even though many of these terms identify a cheese or processed meat that once came only from the place referred to in the name (e.g., CHEDDAR originated in Cheddar, England; BRIE originated in Brie, France; and BOLOGNA originated in Bologna, Italy)." *Id.* The terms cheddar, brie, and bologna all became generic terms over time through genericide.

Plaintiffs correctly note that the USPTO examination guide is nonbinding guidance that does not have the force of law, but courts have nonetheless considered the persuasive reasoning of nonbinding agency guidance under the doctrine of *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). As the Fourth Circuit has noted, when nonbinding agency guidance is relevant, courts may "afford the agency modest *Skidmore* deference, to the extent the agency's reasoning gives it power to persuade." *Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635, 643–44 (4th Cir. 2018). Here, the USPTO's Trademark Examination Guide reasonably concludes that cheese terms given standards of identity have become so commonplace that they have essentially become generic. Indeed, inclusion of **GRUYERE** as an FDA standard of identity suggests that the term is used to indicate a production process that produces a certain type of cheese, rather than the cheese's geographic place of production. Opinions of both the Federal

Circuit and the TTAB considering certification marks sought to protect geographic origins have similarly relied on government regulations in assessing the genericness of a proposed term. *Institut National Des Appellations D'Origine*, 958 F.2d at 1582 (reasoning that BATF regulations "lend support to the argument that the term [Chablis] is generic."); *Luxco, Inc. v. Consejo Regulador Del Tequila A.C.*, 2017 WL 542344 at *9-10 (TTAB Jan. 30, 2017) (reasoning that "TTB regulations are probative in determining whether a term is distinctive or generic."). Thus, the FDA's standard of identity for **GRUYERE** presents strong evidence that **GRUYERE** is a generic term and that the primary significance of the term indicates a type of cheese and not cheese of a particular geographic origin.

B. *The record confirms that a very large amount of cheese produced outside the Gruyère region of Switzerland and France is imported into the United States and sold here labeled as **GRUYERE***

Defendants have introduced undisputed evidence that a large quantity of cheese produced outside the Gruyère region of Switzerland and France is labeled as **GRUYERE** and imported into the U.S. cheese market. This evidence is highly probative on the question of genericness, for as the Fourth Circuit has explained the genericness inquiry requires "evidence in the record which establishes that when purchasers walk into retail stores and ask for [a product], they regularly mean any brand of [the product] and not specifically [one manufacturer's] products." *Glover*, 74 F.3d at 59. The First Circuit has similarly relied on evidence of a terms common generic use in the market to establish genericness, reasoning that "the more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with one particular producer." *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 706 (1st Cir. 2007). Evidence that **GRUYERE** cheese produced outside the Gruyère region of Switzerland and France pervades the cheese market in the United States and is purchased in substantial quantities directly demonstrates that when cheese consumers in the United States

19

walk into a retail store and ask to purchase **GRUYERE** cheese, they do so without intending to limit their request only to Swiss or French-made cheese.

Defendants point to USDA import data, which shows that from 2010–2020, the majority of **GRUYERE** -labeled cheese imported into the United States was imported from the Netherlands and Germany, not from Switzerland or France.[4] Tens of thousands of kilograms of

---

[4] Plaintiffs do not challenge the accuracy or authenticity of this data, but instead argue that the USDA import data is inadmissible hearsay that is inappropriate to consider at summary judgment. This argument fails, because the statistics fall within the hearsay exception provided by Rule 803(8), Fed. R. Evid. That exception provides that "records, reports, statements, or data compilations, in any form, of public offices or agencies" are exceptions to the hearsay rule. Fed. R. Evid. 803(8). The import data provided by defendants was compiled by the USDA, which is a public agency authorized by statute to implement federal laws related to farming, forestry, agriculture, and food. *See* 7 U.S.C. § 2201. Courts have routinely held admissible statistics compiled by a public agency in the course of carrying out that agency's mission. *See, e.g.*, *Portus Singapore PTE LTD v. Kenyon & Kenyon LLP*, 449 F. Supp. 3d 402 (S.D.N.Y. 2020), *affirmed* 843 Fed. App'x. 389 (2d Cir. 2020) (finding patent application statistics compiled by the United States Patent and Trademark Office admissible as an exception to the hearsay rule); *Bayview Hunters Point Community Advocates v. Metropolitan Transp. Com'n*, 177 F.Supp.2d 1011 (N.D. Cal. 2001), *reversed on other grounds* 366 F.3d 692 (9th Cir. 2002) (finding public transportation ridership statistics compiled by the United States Department of Transportation admissible as an exception to the hearsay rule).

cheese labeled **GRUYERE** were also imported into the United States from Austria, Italy, Egypt, and the Czech Republic during this time period.[5]

Plaintiffs attempt to downplay the significance of this import data, arguing that there is no evidence that any of the cheese produced outside the Gruyère region of Switzerland and France imported into the United States is ever sold to the general public labeled as **GRUYERE**. But this argument is flatly contradicted by the undisputed record evidence, which shows that imported cheese produced outside the Gruyère region of Switzerland and France is sold to consumers labeled as **GRUYERE**. *See, e.g.*, Dkts. 64-1 and 66-1. For example, defendants introduced evidence that Boar's Head sold nearly ███████████ of its Hickory Smoked Gruyere in the U.S. market in 2020. As shown by the label depicted below (and obvious to

| Area/Partners of Origin And General Commodities Imported | | | January - December Quantities | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Partner | Product | UOM | Qty | Qty | Qty | Qty | Qty | Qty | Qty | Qty | Qty | Qty | Qty |
| Netherlands | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 874,441.0 | 809,544.0 | 882,399.0 | 1,127,736.0 | 1,561,731.0 | 1,805,074.0 | 1,584,139.0 | 1,713,230.0 | 1,930,106.0 | 2,045,449.0 | 1,613,043.0 |
| Netherlands | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 0.0 | 0.0 | 776.0 | 0.0 | 632.0 | 1,099.0 | 471.0 | 4,022.0 | 1,055.0 | 959.0 |
| Germany(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 824,777.0 | 744,689.0 | 764,373.0 | 702,747.0 | 507,872.0 | 537,846.0 | 526,169.0 | 426,187.0 | 443,616.0 | 527,996.0 | 346,111.0 |
| Germany(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 943.0 | 0.0 | 0.0 | 1,738.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4,134.0 | 0.0 | 0.0 |
| Switzerland(!) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 182,231.0 | 74,262.0 | 101,589.0 | 91,513.0 | 100,487.0 | 111,089.0 | 168,732.0 | 186,565.0 | 160,833.0 | 48,936.0 | 96,072.0 |
| Switzerland(!) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 382.0 | 435.0 | 1,124.0 | 754.0 | 109.0 | 1,015.0 | 0.0 | 0.0 | 0.0 | 13,374.0 | 36,393.0 |
| Switzerland(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 182,231.0 | 74,262.0 | 101,589.0 | 91,513.0 | 100,487.0 | 111,089.0 | 168,732.0 | 186,565.0 | 160,833.0 | 48,936.0 | 96,072.0 |
| Switzerland(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 382.0 | 435.0 | 1,124.0 | 754.0 | 109.0 | 1,015.0 | 0.0 | 0.0 | 0.0 | 13,374.0 | 36,393.0 |
| Egypt | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 37,752.0 | 42,340.0 | 63,380.0 | 49,513.0 | 47,539.0 | 66,131.0 | 61,094.0 | 71,745.0 | 61,219.0 | 73,453.0 | 61,248.0 |
| Egypt | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 0.0 | 2,752.0 | 0.0 | 0.0 | 0.0 | 1,614.0 | 481.0 | 12,980.0 | 47,226.0 | 34,060.0 |
| Denmark(!) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 18,394.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 43,304.0 |
| Denmark(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 18,394.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 43,304.0 |
| France(!) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 1,269.0 | 2,841.0 | 2,554.0 | 5,541.0 | 0.0 | 182.0 | 5,977.0 | 11,334.0 | 8,577.0 | 11,311.0 |
| France(!) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 38,177.0 | 30,948.0 | 11,997.0 | 13,843.0 | 12,372.0 | 32,144.0 | 15,502.0 | 4,838.0 | 3,652.0 | 4,839.0 | 2,244.0 |
| France(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 1,269.0 | 2,841.0 | 2,554.0 | 5,541.0 | 0.0 | 182.0 | 5,977.0 | 11,334.0 | 8,577.0 | 11,311.0 |
| France(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 38,177.0 | 30,948.0 | 11,997.0 | 13,843.0 | 12,372.0 | 32,144.0 | 15,502.0 | 4,838.0 | 3,652.0 | 4,839.0 | 2,244.0 |
| Austria | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 9,927.0 | 4,789.0 | 640.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 58,917.0 | 0.0 | 0.0 |
| Belgium(!) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 22,462.0 | 17,493.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Belgium(!) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 664.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Belgium-Luxembourg(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 22,462.0 | 17,493.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Belgium-Luxembourg(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 664.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ireland | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 7,516.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Czech Republic | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 23,684.0 | 39,052.0 | 39,052.0 | 18,612.0 | 19,526.0 | 29,392.0 | 56,436.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Italy(!) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 1,166.0 | 0.0 | 6,597.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 19,602.0 | 0.0 | 0.0 |
| Italy(!) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 10,948.0 | 8,269.0 | 12,060.0 | 8,139.0 | 6,618.0 | 0.0 | 0.0 | 4,437.0 | 0.0 | 521.0 | 0.0 |
| Italy(*) | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 1,166.0 | 0.0 | 6,597.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 19,602.0 | 0.0 | 0.0 |
| Italy(*) | 04063053 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 10,948.0 | 8,269.0 | 12,060.0 | 8,139.0 | 6,618.0 | 0.0 | 0.0 | 4,437.0 | 0.0 | 521.0 | 0.0 |
| Tunisia | 04063051 - Gruyere-Process Cheese, Processed, Not Grated Or P | KG | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5,832.0 | 6,998.0 | 0.0 | 0.0 | 0.0 |
| Grand Total | | KG | 2,281,636.0 | 1,917,032.0 | 2,059,998.0 | 2,134,728.0 | 2,386,922.0 | 2,727,571.0 | 2,605,215.0 | 2,622,746.0 | 2,905,836.0 | 2,847,673.0 | 2,434,069.0 |

Dkt. 67-4 at 2.

consumers selecting the cheese), Boar's Head's Hickory Smoked Gruyere product is made in

Germany, imported to the United States, and sold as a **GRUYERE** cheese. Dkt. 66-1.



Dkt. 66-1 at 2.

Defendants also introduced evidence that in 2020 Dietz & Watson sold over ███

███ of its cheese labeled **GRUYERE** in the United States. Dkt. 64-1. As with the Boars'

Head Hickory Smoked Gruyere, this cheese is made in Germany and is imported into the United

States and sold here as **GRUYERE** cheese. Defendants have also introduced into evidence the

label of Dietz & Watson's **GRUYERE** cheese, which states clearly that the cheese is a product

of Germany.

 

Dkt. 64-1 at 18-19.

Contrary to plaintiffs' claims, therefore, defendants have clearly demonstrated that hundreds of thousands of pounds of cheese produced outside the Gruyère region of Switzerland and France is imported into the United States and sold in the United States labeled as **GRUYERE**. Evidence that large amounts of cheese imported into the United States and sold as **GRUYERE** cheese is strong evidence that the primary significance of the term **GRUYERE**, as understood by cheese purchasers in the United States, refers to a generic category of cheese products, and not exclusively to a cheese produced in the Gruyère region of Switzerland and France.

*C.   The record also confirms that a large amount of cheese produced in the United States is sold into United States cheese purchasers labeled as **GRUYERE***

In addition to cheese imported into the United states and sold as **GRUYERE**, defendants have also provided undisputed evidence that millions of pounds of domestic-produced cheese are sold as **GRUYERE**. Moreover, domestic **GRUYERE** cheese has been produced and sold in the

United States for decades, dating back to the 1980s. The largest producer of American

**GRUYERE** is Emmi Roth. As discussed above, Emmi Roth ceased labeling its own branded

cheeses as **GRUYERE** in 2013, but continued to allow its private label customers to brand the

Wisconsin-made cheese as **GRUYERE**. Sales data from Emmi Roth shows that Emmi Roth has

sold more than ████████████ of this private label cheese every year from 2014 to 2020, with

the volume of private label **GRUYERE** exceeding ████████████ in 2018 alone. *See* Dkt. 67-

3 at 22.

| Sales in Pounds, of | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Domestic Roth branded Gruyere | | | ████████████████████████████████████████ | | | | | | |
| Domestic Private Label Branded Gruyere | | | | | | | | | |

Plaintiffs do not dispute the accuracy of these sales figures, but instead argue that

defendants cannot prevail on summary judgment because defendants have not shown that every

piece of private label cheese sold by Emmi Roth is resold to consumers as **GRUYERE**.

Plaintiffs argue that some private label customers likely resell the cheese as "Alpine Wisconsin"

or another fanciful name. Plaintiffs contend that the row of the above table labeled "Domestic

Private Label Branded Gruyere" is misleading, because not all of the cheese represented here is

repackaged as **GRUYERE**. Again, this argument misses the mark, as defendants have shown

that a substantial volume of Emmi Roth's private label cheese is, in fact, relabeled and sold as

**GRUYERE**. For example, defendants have introduced evidence that every year ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ Defendants have provided uncontested record

evidence that ███████████████████████████████████████ stores all sell

Emmi Roth's Wisconsin-made cheese as **GRUYERE** cheese. There is little doubt, therefore, that Emmi Roth's Wisconsin cheese is widely available labeled as **GRUYERE** and that a large amount of this cheese is bought by US cheese consumers every year.[6]

Moreover, this abundance of Wisconsin **GRUYERE** is not news to Emmi Roth or to plaintiffs. Emmi Roth spent decades producing, packaging, and selling its own Wisconsin **GRUYERE** cheese to consumers in the United States.[7] It was not until 2013 that Emmi Roth and plaintiffs reached an agreement that Emmi Roth would stop labelling this cheese as **GRUYERE** and begin calling it "Alpine reserve" and "Grand Cru." The evidence also shows that Emmi Roth has written its private label customers acknowledging that these customers re-label Emmi Roth's cheese as **GRUYERE** and tacitly approving of the procedure. Therefore, plaintiffs efforts to control the use of the term of **GRUYERE** have been ineffective and the genericide of the term **GRUYERE** continued, despite the agreement between Emmi Roth and plaintiffs, by virtue of Emmi Roth's private label customers relabeling Wisconsin-made cheeses as **GRUYERE**.

Defendants have also introduced record evidence that other cheesemakers in the United States label and sell their cheese as **GRUYERE**. For example, the undisputed record evidence

---

[6] Plaintiffs argue that even if most domestic cheese labeled **GRUYERE** is sold directly to consumers, a large portion of domestic gruyere might nevertheless be sold to food service providers, "such as restaurants, cafeterias, and country clubs, which use the cheese in foods they prepare." Dkt. 86 at 20. But this distinction has no bearing on the genericness inquiry, because these food service providers —who plaintiffs allege purchase **GRUYERE** cheese en masse — are part of the "relevant purchasing public" whose understanding of the term **GRUYERE** is central to the analysis in this case. *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 640 (Fed. Cir. 1991) (explaining that the Lanham Act is clear "that the relevant public for a genericness determination is the purchasing or consuming public").

[7] The record evidence provided by defendants contains numerous labels for cheeses produced by Roth in Wisconsin and sold in the United States labeled as **GRUYERE** cheese. *See* Dkt. 67-3.

shows that Glanbia, a cheesemaker based in Blackfoot, Idaho, began producing **GRUYERE** cheese in 2016 and has produced and sold approximately ███████████ of cheese labeled **GRUYERE** since then, including over ██████████ of **GRUYERE** sold in 2020. *See* Dkts. 81, 81-A. Defendants introduced evidence that this cheese is labeled **GRUYERE** and that the label states that the cheese is made in Idaho. *Id.* Moreover, defendants introduced evidence that there are additional, smaller cheesemakers in the United States who label and sell their cheese made in the United States as **GRUYERE** cheese, including Red Apple Cheese and Burnett Dairy. Defendants have introduced the labels of these smaller cheesemakers which confirm, without dispute, that these cheesemakers produce and sell cheese made in the United States labeled as **GRUYERE**.

The evidence that hundreds of thousands of pounds of non-Swiss, non-French cheese labeled as **GRUYERE** are purchased in the United States every year is convincing evidence that American cheese consumers understand the term **GRUYERE** to be generic rather than a term that indicates cheese from a limited geographic area. As the Federal Circuit has explained, "evidence that other companies use [the challenged term] in combination with their own" products is probative on the issue of genericness. *Royal Crown Company*, 892 F.3d at 1370.

Plaintiffs attempts to downplay the undisputed evidence that large amounts of cheese produced outside the Gruyère region of Switzerland and France are sold in the United States labeled as **GRUYERE** are unconvincing. Plaintiffs argue that Emmi Roth's private label customers seek to "hide the cheese's Wisconsin origin" from consumers by giving the cheeses French-sounding names, such as "Blanc Grue." Dkt. 86 at 22. This argument is undermined by the factual record, which shows that many of Emmi Roth's private label customers prominently display the cheese's Wisconsin origins, as the below labels demonstrate.

 

Dkts. 66-A, 72-4 at 32.

Plaintiffs also argue that defendants "provide no evidence as to the sales levels" of various cheeses produced outside the Gruyère region of Switzerland and France which are sold labeled as **GRUYERE**. This claim is flatly wrong. The record contains annual sales data from various cheese producers and retailers in the United States, including Wegmans, *see* Dkt. 72-4 (showing annual sales of ▮▮▮▮▮▮ of domestic **GRUYERE**), Boar's Head, *see* Dkts. 82, 83 (showing sales of ▮▮▮▮▮▮▮▮ of domestic **GRUYERE**), and Glanbia, *see* Dkts. 81, 81-A (showing annual sales of ▮▮▮ ▮▮▮▮▮▮▮ of domestic **GRUYERE** since 2016). Although Plaintiffs correctly 'note that defendants have not provided the exact market share of cheese produced outside the Gruyère region of Switzerland and France sold as **GRUYERE** in the United States, this argument fails as market share evidence is not required to establish genericness. Plaintiffs cite no case in support of the claim that market share evidence is required, and no such case exists. Further, the evidence provided by defendants, which includes import

27

data showing that the bulk of imported **GRUYERE** comes from outside Switzerland and France, as well as sales data showing substantial sales of **GRUYERE** produced in the United States, demonstrates that Swiss and French **GRUYERE** certainly do not dominate the market, but that cheese consumers in the United States instead regularly encounter and purchase **GRUYERE** cheese produced outside the Gruyère region of Switzerland and France.

In summary, the plaintiffs' arguments opposing summary judgment are insufficient and unconvincing. As the Fourth Circuit has explained, mere conclusory denials are insufficient to oppose summary judgment, as "[t]he opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Plaintiffs have failed to show that any triable issue of fact exists, and plaintiffs' arguments are contradicted by the factual record. None of plaintiffs' unsupported assertions rise to the level of a triable issue of factual dispute.

D. *Evidence of common usage of the term gruyere, including reference materials, media coverage, and industry practice, confirms that the term has become generic*

Both plaintiffs and defendants have introduced numerous dictionary definitions of the term **GRUYERE**. Some dictionaries define **GRUYERE** cheese as a mild-flavored, nutty, yellow cheese made from cow's milk without mentioning any geographic restrictions, while others define **GRUYERE** as a cheese with Swiss origins. The Merriam-Webster dictionary defines "gruyere" as "a firm cheese with small holes and a nutty flavor that is of Swiss origin," *Gruyere*, Merriam-webster.com (last visited November 29, 2021), but defines "gruyere cheese" as "a pressed whole-milk cheese of a pale yellow color and nutty flavor and usually with small holes" without any mention of geographic origin. *Gruyere cheese*, Merriam-webster.com (last visited November 29, 2021). Defendants point to various dictionaries which define **GRUYERE** without mentioning that **GRUYERE** cheese must come from the Gruyère region of Switzerland or France. *See, e.g.*,

*Gruyere*, American Heritage Dictionary of the English Language (5th ed. 2016; via thefreedictionary.com) (defining gruyere as "A nutty, pale yellow, firm cheese made from cow's milk" without reference to any geographic origins); *Gruyère*, English Oxford Living Dictionaries, https://en.oxforddictionaries.com (defining **GRUYERE** as "A firm, tangy cheese"). Plaintiffs note that some dictionaries define **GRUYERE** by reference to its regional origins. *See, e.g.*, *Gruyère*, Encyclopedia Britannica (defining gruyere as "Gruyère, hard cow's-milk cheese produced in the vicinity of La Gruyère in southern Switzerland and in the Alpine Comté and Savoie regions of eastern France."); *Gruyere*, The Free Dictionary (defining gruyere as "A kind of cheese made at Gruyère, Switzerland"). Yet another dictionary, Random House, defines **GRUYERE** as "a firm yellow cow's milk cheese, especially of France and Switzerland, having small holes." *Gruyere*, Random House Kernman Webster's College Dictionary (2010; via thefreedictionary.com).

Viewed as a whole, the dictionary evidence points to the conclusion that the term **GRUYERE** is not restricted to cheese produced in the Gruyère region of Switzerland and France. Although some dictionaries note that the cheese was originally produced in Switzerland, a number of dictionaries, including Merriam-Webster, the Oxford English Dictionary, and the American Heritage Dictionary, all support defendants' contention that the term **GRUYERE** is primarily understood to refer to a generic type of cheese without regard to geographic origin.

In addition to the dictionary evidence, defendants have produced substantial evidence of industry publications and trade materials suggesting that within the United States the term **GRUYERE** is understood generically and is commonly used to refer to a type of cheese regardless of where that cheese was produced. The TTAB opinion collected examples of newspaper articles, trade publications, and websites, all provided by defendants, that used the term **GRUYERE** to refer to Wisconsin-produced cheese. *See* TTAB Opinion, Dkt. 1, at 31-37.

Defendants also introduced approximately fifty press articles referring to **GRUYERE** cheese which did not reference production in Switzerland or France. *Id.* at 31. Another ten articles specifically discussed "Wisconsin gruyere," thus recognizing Wisconsin as a production location for **GRUYERE** cheese. *Id.* at 31-32. Plaintiffs did not offer any opposing press or media usage evidence into the TTAB record. The TTAB record also contains several trade publications, which acknowledge that Wisconsin cheesemakers produce **GRUYERE** and that the cheese was also being made in European countries other than Switzerland and France. *Id.* at 32-33. Against this evidence, plaintiffs offered just four pieces of evidence: two online-dictionary definitions (discussed previously), one printout from Wikipedia, and one European cheese guide. *Id.* at 48-49. Significantly, plaintiffs have not introduced new common usage evidence to augment the record presented to the TTAB.

The Federal Circuit has made clear that evidence of common media and industry usage of a term is highly probative on the question of whether that term is generic, noting that "articles constitutes evidence that the [relevant] public understands the term … to refer to a type of restaurant as well as a dish." *In re Cordua Restaurants, Inc.*, 823 F.3d at 604. The weight of the common usage evidence in the record tilts strongly in defendants' favor. Nor is this surprising, given that the process of genericide has continued inexorably.

Defendants also introduced evidence that professional cheese competitions held in the United States and abroad have included non-Swiss, non-French cheeses competing in the **GRUYERE** category. The presence of these cheeses demonstrates that **GRUYERE** is a generic term. There is no dispute that awards given at cheese competitions are valuable currency for cheese manufacturers. In this regard, the record shows that cheese makers often mention which awards they have won on the packaging for their cheeses. *See, e.g.*, Dkt. 67-3 (showing a Roth

Käse **GRUYERE** label displaying the cheese's awards at various cheese competitions and identifying the cheese as made in Wisconsin). The World Championship Cheese Competition, held in Wisconsin, has a category for **GRUYERE** cheese. Although many entrants in the **GRUYERE** category were cheeses produced in Switzerland and France, there were non-Swiss, non-French entrants in the **GRUYERE** competition in every year from 1995 to 2018. It is worth noting that these non-Swiss, non-French **GRUYERE** entrants hailed from the United States, Australia, South Africa, and Denmark, further demonstrating the widespread genericness of the term **GRUYERE**.

Plaintiffs point to a European competition, the World Cheese Awards, where all entrants in the **GRUYERE** category for the relevant period have come from Switzerland. But evidence of a European cheese competition does little to explain how cheese purchasers in the United States, who constitute the relevant purchasing public for this genericness inquiry, understand the term **GRUYERE**. The defendants argue as much in their reply brief, noting that the World Cheese Awards are less relevant than the World Championship Cheese Competition because the former is held in Europe, while the latter is held in the United States, and pointing out that the genericness inquiry turns on the understanding of cheese consumers in the United States, not European ones.

The record evidence of common usage and industry practice points clearly to the conclusion that while some individuals understand **GRUYERE** to have an association with Switzerland (and, to a lesser degree, France), the term **GRUYERE** has come to have a well-accepted generic meaning through the process of genericide and is no longer universally understood to indicate cheese produced in the Gruyère region.

## IV.

In summary, the undisputed evidence produced by the parties in this case makes clear that the primary significance of the term **GRUYERE**, as understood by the relevant purchasing public in the United States, is a generic term for a type of cheese and does not refer solely to cheese from a specific geographic region. Thus, the term **GRUYERE**, through the process of genericide, has become generic and is ineligible for registration as a certification mark. It is clear from the record that the term **GRUYERE** may have in the past referred exclusively to cheese from Switzerland and France. However, decades of importation, production, and sale of cheese labeled **GRUYERE** produced outside the Gruyère region of Switzerland and France have eroded the meaning of that term and rendered it generic. The term **GRUYERE** has "cease[d] to identify in the public's mind the particular source of" a given cheese "but rather identifies a class of product or service, regardless of source." *Glover*, 74 F.3d at 59. The record "evidence overwhelmingly demonstrate[s] the generic nature of the word" **GRUYERE** and thus summary judgment must be granted in favor of defendants. *Retail Servs., Inc.* 364 F.3d at 541

An appropriate Order reflecting the issues in this Memorandum Opinion will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
December 15, 2021

T. S. Ellis, III
United States District Judge